[No. C049364. Third Dist. Nov. 9, 2006.]

WESTERN PLACER CITIZENS FOR AN AGRICULTURAL AND RURAL ENVIRONMENT, Plaintiff and Respondent, v. COUNTY OF PLACER et al., Defendants and Appellants; TEICHERT, INC., Real Party in Interest and Appellant.

COUNSEL

Anthony J. LaBouff, County Counsel, and Valerie D. Flood, Deputy County Counsel, for Defendants and Appellants.

Taylor & Wiley, John M. Taylor, Jesse J. Yang and Kate A. Leary for Real Party in Interest and Appellant.

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiff and Respondent.

OPINION

NICHOLSON, J.—The superior court determined a county's environmental impact report analyzing a proposed aggregate mine violated the California

Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)) by failing to include and analyze a slightly revised project description submitted by the applicant after the final environmental impact report was prepared, and by inadequately analyzing water supply issues. We reverse.

## FACTS

In December 1994, real party in interest Teichert, Inc. (Teichert), submitted permit applications for a 100-year project to mine and process sand, gravel, and granite on 945 acres of a 1,878-acre site located four miles north of Lincoln in unincorporated Placer County. Coon Creek, a perennial stream, traverses the central portion of the site and flows south westward. Doty Ravine crosses the southern tip of the site flowing westward, then joins Coon Creek. The site is currently operated as a cattle ranch with most of the level land in permanent pasture, hayfield or livestock food crops, and the remaining land used primarily as rangeland. The state Department of Conservation has designated virtually all of the site as prime farmland and farmland of local importance.

In December 1994, defendant County of Placer (County) issued a notice of preparation of an environmental impact report (EIR). It received numerous comments and complaints, in particular opposing Teichert's plan to locate the mine's processing plant near existing residences and to direct truck traffic to and from the site on narrow, substandard roads abutted by existing residences. Teichert withdrew its proposal in 1995.

Subsequently, Teichert purchased 1,577 acres west of the original project site. It redesigned the project in response to many of the public's concerns. It moved the processing plant to a remote location away from the residences, provided a direct truck route to Highway 65 to avoid using existing roads, and increased setbacks from abutting property owners.

In 1996, Teichert submitted revised permit applications incorporating these changes. The new proposal called for an 85-year project to mine and reclaim 1,000 acres of the now 3,455-acre site. Teichert would process 37 million tons of sand and gravel and 122 million tons of granite. Aggregate mining and reclamation would occur in nine successive phases, beginning on the site's southwest area (phase 1) and moving in order to the northeast (phases 2–9).

The County and its consultant released a draft EIR in 1999, more than two years after Teichert submitted its revised applications. The draft EIR analyzed several project alternatives, including one that came to be designated as the "Mitigated Design Alternative." This proposal would reduce the project's length from 85 years to 40 years and reduce the mining and processing areas from 1,000 acres to 785 acres.

The County publicly circulated the draft EIR for 100 days, and received numerous comments. In response, the County revised 11 chapters of the draft EIR and six technical appendices. The County then recirculated the revised chapters and appendices for another 60 days (the revised draft EIR (RDEIR)), and received additional comments thereon.

Portions of the land proposed to be mined were covered by California Land Conservation Act of 1965 (Williamson Act) contracts that would prohibit mining. During 2000 and 2001, Teichert met with County staff regularly to resolve this and other issues. As a result of such a meeting held in November 2001, Teichert proposed to implement the Mitigated Design Alternative as its project, except it would change the phasing. Under the new phasing, mining would occur so as to avoid mining on those lands affected by the Williamson Act contracts until the contracts expired. Thus, instead of moving in order from southwest to northeast, aggregate mining and reclamation in general would begin in the middle of the site, go back southwest, then jump over the middle and continue to the northeast, still in nine phases. Using the former phase designations, mining would begin in former phase 4, proceed northeast to former phase 5, go back to former phases 3, 2, and 1, then go northeast again from former phase 6 through phase 9.

The County released the final EIR (FEIR) on January 21, 2002, some seven years after Teichert filed its initial application. This document incorporated the County's responses to the comments received during both circulation periods. The FEIR mentioned the project could avoid conflicts with the Williamson Act by delaying mining on those lands affected by Williamson Act contracts. It did not, however, include a revised description of the project reflecting Teichert's decision to proceed with that suggestion and change its phasing to avoid the affected lands, nor did it analyze whether the change in phasing created additional impacts.

Four days later, January 25, 2002, Teichert submitted a revised project application to implement the Mitigated Design Alternative project with the

change to the phasing. A second proposed change involved relocating the portable processing plant to the site of the permanent plant. Teichert's latest proposal became known as the Revised Mitigated Design Alternative.

Before the County Planning Commission, plaintiff Western Placer Citizens for an Agricultural and Rural Environment (WPCARE) and others objected to the proposed project and the adequacy of the FEIR on numerous grounds. On November 12, 2002, the planning commission certified the FEIR and unanimously approved the project.

WPCARE appealed the decision to the board of supervisors (the Board). On December 17, 2002, the Board denied the appeal, approved the revised project, and directed its staff to prepare findings and conditions of approval. On February 4, 2003, the Board formally approved the project.

WPCARE filed a petition for writ of mandate, alleging the County's review of the project violated CEQA in numerous respects. The trial court disagreed with WPCARE on all but two grounds. It concluded the FEIR violated CEQA by (1) not describing the Revised Mitigated Design Alternative project with its new phasing; and (2) inadequately analyzing the availability of a long-term water supply. The court ordered a writ of mandate issue directing the County to set aside its approval of the project and certification of the FEIR, and to refrain from granting further approvals pending certification of a revised FEIR.

Teichert and the County challenge the trial court's ruling.

## DISCUSSION

### I

### *Standard of Review*

We review the record de novo to determine whether the County prejudicially abused its discretion in certifying the FEIR and approving the project. Under CEQA, an abuse of discretion occurs if the County did not proceed in the manner required by law, its decision was not adequately supported by findings, or its findings were not supported by substantial evidence in light of the whole record. (Pub. Resources Code, §§ 21168, 21168.5.)

### II

### *Revised Project Description*

Teichert argues the trial court erred in determining the FEIR violated CEQA by not identifying and addressing the new phasing. It claims CEQA

does not per se require a revised project description be included in the FEIR itself, and substantial evidence in the record demonstrated the changed phasing was not significant new information requiring additional analysis in, or recirculation of, the FEIR. We agree with Teichert.

## A. *Additional background information*

WPCARE complained about the new project description not being included in the FEIR for further review. Responding to the complaints, County staff noted it had distributed Teichert's new project description to the public at the Rural Lincoln Municipal Advisory Council on February 4, 2002, as part of a document it called a supplemental entitlement detail. The County asserted there was no requirement for a public review of the supplemental entitlement detail "because it serves as the project description upon which the staff prepares their recommendations."

County staff agreed there were changes between the Revised Mitigated Design Alternative and the Mitigated Design Alternative, but "[i]n all cases the changes reflect an improvement in the environmental condition when compared to the original project or the mitigated design alternatives."

Staff stated no further modification of the FEIR was required because the FEIR adequately analyzed the project and its impacts. The changes incorporated into the final proposed project "meet the intent of CEQA (i.e., lessening or eliminating environmental impacts) and show responsiveness to the issues raised." A new draft EIR was not required because the "proposed project is, in all substantive respects, identical to the mitigated design alternative which was examined in the FEIR. The mitigated design alternative was specifically selected as the project description because of its ability to reduce and/or eliminate significant effects."

Approving the project, the Board found the project "as approved is a modification of the mitigated design alternative that was considered in the FEIR. The modifications to the mitigated design alternative does [*sic*] not result in any additional impacts that were not analyzed in the FEIR."

The trial court, however, concluded the Board could not make that finding without first including the new phasing in the EIR: "In their arguments, the parties treat the new phasing as raising a single question: [¶] Was the new

phasing 'significant new information' as defined in Guideline 15088.5(a), requiring that it be added to the RDEIR and that the RDEIR be recirculated before certification of the FEIR[?]

"But it really raises two questions: [¶] 1. Was the new phasing 'new information' that was required to be added to the RDEIR? [¶] 2. If so, was it 'significant' new information, requiring that the RDEIR be recirculated before certification of the FEIR?

"The answer to the first question is yes: As part of Teichert's revised project description, the new phasing was information that CEQA requires to be identified and addressed in the EIR itself. [Citations.]

"The answer to the second question is unknown: Whether new information about a project is 'significant' depends on whether failure to recirculate an EIR containing the new information would deprive the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project. [CEQA] Guideline 15088.5(a).

"By the express terms of Guideline 15088.5, the question of whether to recirculate a published EIR does not arise until the new information is added to the EIR. CEQA requires that the question of any substantial new impacts be identified, addressed, assessed, and resolved in the EIR itself. [Citations.] Only then can the test in Guideline 15088.5(a) be applied and the decision whether recirculation is required be made.

"When it certified the FEIR, the Board of Supervisors found that the new aggregate mining and reclamation phasing would not result in any additional impacts that were not analyzed in the FEIR. Without a description and analysis of the new phasing in the FEIR, there was no substantial evidence to support this finding."

B.  *Exhaustion of administrative remedies*

Teichert initially asserts WPCARE failed to exhaust its administrative remedies on this issue. Teichert claims WPCARE argued the FEIR was inadequate only because the revised phasing was significant new information which CEQA requires be recirculated in a revised EIR. Teichert argues WPCARE failed to exhaust by not arguing for the rule announced by the trial court, that all new information must be included in an EIR whether or not it is significant.

We disagree with Teichert's argument. Less specificity is required to preserve an issue for appeal from an administrative hearing than from a judicial hearing. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [200 Cal.Rptr. 855].) WPCARE's arguments fairly apprised the County, Teichert, and the trial court it believed the FEIR was legally inadequate because the project description did not include the changed phasing and the document did not discuss whether the new phasing created unaddressed environmental impacts. This was sufficient to satisfy the requirements of CEQA. (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 175–177 [258 Cal.Rptr. 147].)

Having found the issue sufficiently raised, we need not address Teichert's claim the trial court erred by addressing an issue on its own volition.

## C. *Including all new information in the FEIR*

■ The EIR is the "heart of CEQA." (Guidelines, § 15003, subd. (a);[1] see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*), original italics.) "To this end, public participation is an 'essential part of the CEQA process.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

■ A description of the project is an indispensable component of a valid EIR. "We reiterate—an accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR. The defined project and not some different project must be the EIR's bona fide subject. The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199–200 [139 Cal.Rptr. 396].)

---

[1] All references to "Guidelines" are to the state CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000.)

"CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].) Analysis in an EIR "must be specific enough to permit informed decision making and public participation. . . . The need for thorough discussion and analysis is not to be construed unreasonably, however, to serve as an easy way of defeating projects. 'Absolute perfection is not required . . . .' [Citations.]" (*Laurel Heights I, supra*, 47 Cal.3d at p. 406.)

■ When interpreting CEQA, courts are not authorized to impose requirements not present in the statute. "It is the intent of the Legislature that courts, consistent with generally accepted rules of statutory interpretation, shall not interpret this division or the state guidelines . . . in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines." (Pub. Resources Code, § 21083.1.)

The trial court determined the EIR had to be revised to include the changes made to the project before the County determined whether the changes were significant enough to require recirculation. The authority the court cited to support its holding does not expressly do so. The parties have directed us to no provision in CEQA or the Guidelines, and we have found none, that requires all changes made to a project after the final EIR is released but prior to certification to be included in the EIR.

The closest CEQA comes to addressing this issue is when it discusses the requirement to recirculate an EIR. The relevant provision of CEQA, section 21092.1, reads in part: "When significant new information is added to an environmental impact report after notice has been given pursuant to Section 21092 [notice of availability of draft EIR for public review] and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report." (Pub. Resources Code, § 21092.1.)

The Guidelines clarify this directive as follows:

"(a) A lead agency is required to recirculate an EIR when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review under [Guidelines] Section 15087 but before certification. As used in this section, the term 'information' can include changes in the project or environmental setting as well as additional data or

other information. New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement. 'Significant new information' requiring recirculation includes, for example, a disclosure showing that:

"(1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented.

"(2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance.

"(3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

"(4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. (Mountain Lion Coalition v. Fish & Game Com. (1989) 214 Cal.App.3d 1043 [263 Cal.Rptr. 104].)

"(b) Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR.

"(c) If the revision is limited to a few chapters or portions of the EIR, the lead agency need only recirculate the chapters or portions that have been modified. [¶] . . . [¶]

"(e) A decision not to recirculate an EIR must be supported by substantial evidence in the administrative record." (Guidelines, § 15088.5.)

Thus, the statute and Guidelines explain what to do when significant information is added to an EIR, but they do not address whether an agency must add all information to an EIR before determining whether the information is significant and triggers recirculation.

The California case closest to addressing the issue, *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134 [58 Cal.Rptr.2d 152] (*Chaparral Greens*), implies not all new information must be added to the EIR. There, a developer proposed a massive residential development on a large tract of land in San Diego County. The land included coastal sage scrub habitat and more than 80 varieties of sensitive, threatened or endangered plant and animal species. It was within an area addressed by two regional conservation planning programs being developed by the county. (*Id.* at pp. 1139–1140.)

After the final EIR was issued jointly by the City of Chula Vista and the county, the county developed new information as part of its conservation planning programs that established the tract's importance in regional multi-species preservation efforts. The county, along with federal and state agencies, also proposed restricting loss of coastal sage scrub habitat due to development to five percent within any one subregion. (*Chaparral Greens, supra*, 50 Cal.App.4th at pp. 1140–1141.)

During administrative hearings on the proposed project, a number of people argued the EIR needed to be revised and recirculated to reflect these new developments. The city and county did not revise or recirculate the EIR. The plaintiffs sued, claiming the local agencies violated CEQA by failing to consider the new information. The trial court denied the plaintiffs' petition for writ of mandate, and the Court of Appeal affirmed. (*Chaparral Greens, supra*, 50 Cal.App.4th at pp. 1141–1142, 1154.)

"The question here," the appellate court wrote, "is whether Respondents' implicit decision not to recirculate the [EIR] (i.e., the decision that the new information was not 'significant') was supported by substantial evidence. (*Laurel Heights II, supra*, 6 Cal.4th at pp. 1132–1135.) Although Chaparral Greens urges this court to undertake an independent review of this issue, its position is untenable. Only the addition of *significant* new information triggers the need for recirculation under section 21092.1 and thus the agency's first obligation is to determine whether the new information meets this statutory requirement. In this context, a procedural violation cannot exist 'unless the [agency's] decision regarding the significance of the new information fails to pass muster under the [substantial evidence] standard of review.' (*Laurel Heights II, supra*, 6 Cal.4th at p. 1134.)" (*Chaparral Greens, supra*, 50 Cal.App.4th at p. 1147, original italics.)

The court reviewed the new information which was contained in the administrative record but not the EIR, and concluded substantial evidence

supported the local agencies' determination that the information was not "significant" within the meaning of CEQA. The agencies' decision not to revise the EIR and recirculate was appropriate. (*Chaparral Greens, supra,* 50 Cal.App.4th at pp. 1148, 1151.) Nowhere did the court fault the agencies for determining the information was not significant without first including the information in the EIR. It stated the local agencies did not violate CEQA by not revising the EIR and recirculating it.

The approach taken by the agencies in *Chaparral Greens* was consistent with an approach upheld by the Supreme Court in *Goleta Valley, supra,* 52 Cal.3d 553. There, opponents of an oceanfront resort hotel argued a supplemental EIR failed to consider a reasonable range of alternative sites to the project. The planning commission certified the EIR, and the opponents appealed the decision to the county board of supervisors. Prior to hearings before the board, the opponents submitted a letter urging the county to consider seven additional sites in another supplemental EIR. (*Id.* at pp. 561–562, 567.)

After hearings, the board filed the EIR without revising it, approved the project, and adopted findings. The findings included the county's analysis and determination that none of the opponents' suggested new sites were feasible alternative sites. On appeal, the opponents claimed the county violated CEQA by not including this analysis in the EIR. (*Goleta Valley, supra,* 52 Cal.3d at pp. 562–563, 568.)

The Supreme Court concluded the county did not violate CEQA by not including its analysis in the EIR. Due to the timing of the opponents' letter well after the public comment period expired, the county did not abuse its discretion by explaining its reasons for rejecting the sites by means of administrative findings rather than another EIR. (*Goleta Valley, supra,* 52 Cal.3d at pp. 568–570.)

These cases indicate all new information occurring after release of the final EIR but prior to certification and project adoption need not be included in the EIR before the agency determines whether the new information is significant so as to trigger revision and recirculation. Contrary to CEQA, the trial court in the case before us imposed a procedural requirement beyond that expressly stated in the statute or the Guidelines.

■ This conclusion is consistent with policy underlying the National Environmental Policy Act of 1969 (NEPA), 42 United States Code section 4321

et seq., which we may view as persuasive authority when interpreting CEQA. (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86, fn. 21 [118 Cal.Rptr. 34, 529 P.2d 66].) Deciding whether a public agency had to revise and recirculate an environmental impact statement (EIS) when it selected an alternative not analyzed in the document, the Ninth Circuit Court of Appeals observed: "The main policy reason for soliciting public comment is to use public input in assessing a decision's environmental impact. [Citations.] To effectuate this purpose, agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input. If an agency must file a supplemental draft EIS every time any modifications occur, agencies as a practical matter may become hostile to modifying the alternatives to be responsive to earlier public comment. Moreover, requiring agencies to repeat the public comment process when only minor modifications are made promises to prolong endlessly the NEPA review process." (*State of Cal. v. Block* (9th Cir. 1982) 690 F.2d 753, 771.)

We thus conclude CEQA does not require a lead agency to revise a final EIR to include any new information or project changes that arise after the EIR is released but prior to certification before the agency determines whether the information is significant enough to require the EIR be recirculated. This conclusion, however, does not end our analysis. We are now left with the question the trial court refused to address: Is the County's determination that the new phasing was not significant new information requiring revision and recirculation of the EIR supported by substantial evidence in the record?

D.   *Significance of new information*

We give the County's determination substantial deference and presume it to be correct. WPCARE bears the burden of proving substantial evidence does not support the County's decision not to revise and recirculate the FEIR. (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497 [19 Cal.Rptr.3d 1].)

At trial, WPCARE complained there was no review of potential significant environmental impacts caused by the change in phasing. It also alleged the change created confusion, leading, for example, the Department of Conservation to note in a letter dated March 18, 2002, that the proposed reclamation plan originally attached to the FEIR was no longer based on the actual project being approved.

As noted above, county staff reviewed the change and determined, and the Board found, the change created no new environmental impacts. Indeed, the County determined "[i]n all cases the changes reflect *an improvement in the environmental condition* when compared to the original project or the mitigated design alternatives." (Italics added.) Mining on lands encumbered with Williamson Act contracts is delayed, and impacts from having two processing plant sites are reduced by eliminating the temporary plant site.

As we just determined, CEQA did not require the Board to include that analysis in the FEIR or even to make a written finding or order to that effect. By certifying the FEIR, the Board necessarily concluded the new information did not require recirculation and additional public comment. (*Laurel Heights II, supra,* 6 Cal.4th at pp. 1133–1134.) Substantial evidence in the record supports that determination.

As for the confusion over the reclamation plan, the reclamation plan originally included in the FEIR and submitted to the Department of Conservation was revised in September 2002, before the FEIR was certified, to reflect the project's revised phasing and the relocation of the plant. The revised plan was submitted to the Department of Conservation for review and comment. The Department of Conservation made no comment on the revised plan, and the Board approved it when it approved the project. Thus, whatever inconsistencies existed between the revised project and the reclamation plan were remedied before the Board approved the project. By approving the revised reclamation plan with the project, the Board's findings that the revised phasing was not significant new information for purposes of CEQA applied equally to the revised reclamation plan.

WPCARE proffers arguments regarding the effect the new phasing may have on two specific mitigation measures. WPCARE failed to raise these arguments below, and thus forfeits them here. (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].)

Were we to rule on WPCARE's new arguments, we would disagree with each of them. One of WPCARE's forfeited arguments was raised by the trial court. The entire area to be mined lies within the 100-year floodplain. The court suggested a mitigation measure designed to reduce flooding impacts could have been adversely affected by the revised phasing. The measure called for a berm to be built around the permanent plant site to protect the settling ponds from inundation in the event of a flood. This, however, would eliminate flood storage land for approximately 150 acre-feet of flood water. In response, the FEIR designated the phase 1 excavation as an offsetting storage

area for that water. The court wondered if the determination to excavate phase 4 first instead of phase 1 removed that additional storage.

The obvious answer is the pit dug in what was once phase 4 would serve the same purpose. Indeed, the FEIR indicates phase 4 will create a larger pit than phase 1, resulting in greater flood water storage than originally planned. Had WPCARE timely raised this argument, the County correctly would have determined this information did not trigger revision and recirculation of the FEIR.

WPCARE's second forfeited argument concerned possible impacts the new phasing might have on another mitigation measure. The FEIR concluded one impact from the project would be the possible uncontrolled overflow of Coon Creek north of phase 9 into the mining pit during a flood. Such an uncontrolled flow could result in headcutting of the channel, erosion of the bank, and possible permanent redirection of the entire Coon Creek flow into the mining pit. To mitigate this possible impact, the FEIR proposed Teichert construct a hardened bank overflow area. This would allow the creek to overtop its bank and overflow into the mining pit in a controlled manner without risk of the bank collapsing. A hardened surface would be built within the existing bank to direct the overflow. The overflow area is to be constructed before the fourth phase of mining begins.

WPCARE asserts without argument or analysis the change in phasing could impact this mitigation measure. We do not see how. The possibilities of bank failure are minimal until the pit approaches the creek in the final phases. Teichert can still construct the overflow area before it begins phase 4, which will ensure the improvement exists as the pit moves closer to the creek. That its fourth phase is now the original phase 2 makes little difference. The pit will still be hundreds of feet away from the creek at that time, and the last three phases will still be done in the order originally planned. Had WPCARE timely raised this argument also, substantial evidence would have supported the County's determination that this information did not trigger revision and recirculation of the FEIR.

On this particular issue, CEQA fulfilled its purpose. Years of environmental review informed the public and the decision makers of the environmental consequences of Teichert's proposed mine before it was approved. (See *Goleta Valley, supra*, 52 Cal.3d at p. 564.) As a result, both the County and Teichert, with significant input from the public, were able to work to " '[i]dentify ways that environmental damage [could] be avoided or significantly reduced.' " (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91

Cal.App.4th 1344, 1354 [111 Cal.Rptr. 2d 598], quoting Guidelines, § 15002.)

WPCARE has failed to satisfy its burden of proof. Substantial evidence supports the County's decision not to revise and recirculate the FEIR to include the changed phasing and the relocation of the plant site. The evidence demonstrates the approved project is more environmentally sensitive than the Mitigated Design Alternative, which was fully analyzed in the FEIR. The record supports the County's conclusion the revised phasing created no new impacts from what was already discussed in the FEIR. CEQA did not require the County to delay the project further in order to evaluate the new project's reduced impacts on the environment.

### III

### *Water Supply Analysis*

Teichert argues the trial court erred when it determined no substantial evidence supported the County's finding there would be sufficient water to supply the project's needs through its mining life and its reclamation requirements. We agree with Teichert.

In its decision the trial court noted that Teichert anticipates obtaining water from the Nevada Irrigation District (NID). The court said: "Teichert's use of NID water is based on a year-to-year contract, not on priority in time, right, or proximity. Part of the present availability of NID water is due to a substantial number of other present users not presently using their full contract allotments, not a reliable basis for predicting future water availability to Teichert." As Teichert points out, this was factual error.

There are, in fact, multiple sources of water available to the property:

(1) NID provides water to customers within its service area during the dry season, generally mid-April to mid-October.[2] Customers within the district are entitled to a pro rata share of NID water. Teichert's pro rata share of NID water is approximately 2,437 acre-feet per year. This is a matter of right and has priority over anyone but other NID customers with a pro rata allotment. Thus, so long as NID has sufficient water to meet the demand of customers with pro rata rights, Teichert is entitled to 2,437 acre-feet per year.

---

[2] NID operates storage reservoirs in the Sierra Nevada and uses water from the reservoirs to supply customers in the Coon Creek watershed. NID can augment its supplies with supplemental water purchased from Pacific Gas and Electric Company.

(2) NID has surplus water available for sale. Surplus water is available because many customers within the service area do not use their full pro rata share. Surplus water may be purchased on a year-to-year contract basis by customers within or without the service area. Surplus water sales are subject to the priorities of customers with pro rata rights to NID water. Thus, if more customers began using their full pro rata share, surplus water sales would abate in favor of customers with pro rata rights. This is regarded as unlikely, since the physical conditions of many properties in the area preclude activities that would demand the owner's full pro rata share. In times of drought, surplus water sales would abate in favor of customers with pro rata rights.

(3) NID uses Coon Creek to deliver water to its customers. Coon Creek is a natural watercourse. During the dry season, when NID is delivering water, most of the flow of Coon Creek is NID water. NID water cannot be diverted for riparian and appropriative uses. During the wet season the flows of Coon Creek are mostly natural water flows. Teichert has both riparian and appropriative rights to use the natural flows of Coon Creek.

(4) There is groundwater beneath the surface of the property. Teichert has the right to use groundwater from beneath the property. It intends to use one well to provide 1.5 acre-feet of potable water per year for its mining and processing operations. The mining operation will require that the mining site be dewatered, that is, groundwater will be pumped from the mining site to enable dry mining to be performed. Dewatering will extract 515 acre-feet of groundwater per year during the first 25 years, and then 700 acre-feet annually for the next 15 years. In addition to the 1.5 acre-feet per year of potable water, the mining and processing operations will require only 209 acre-feet of water. Accordingly, the dewatering activities will produce substantially more acre-feet of water per year than the mining and processing operations require. That water would be available for mitigation, agricultural and reclamation activities, but it is anticipated that most of it will be discharged into Coon Creek or Doty Ravine.

(5) The property receives average annual precipitation of 23 inches per year. Natural precipitation rather than irrigation will be relied upon for much of the reclamation and agricultural uses of the property.

It is apparent the trial court believed that Teichert's right to purchase 2,437 acre-feet of water per year was on a contract basis for surplus water. That was clearly a substantial basis for the court's conclusion that the EIR did not sufficiently identify a source of water for the project's needs. However, that was factual error. As noted above, the right to 2,437 acre-feet of NID water is Teichert's pro rata share of NID water and is a matter of right so long as NID has water to fulfill the needs of its pro rata customers. That right has priority over the sale of surplus water by contract and is a far more reliable basis for predicting water availability than a contract for the purchase of surplus water.

It was estimated that in preproject condition there were approximately 717 acres of irrigated land in the mining area. On average that land required 2,523 acre-feet of water per year. Prior owners of the Hoffman Ranch and Coon Creek Cattle Company irrigated 975 acres of land within the project area. Between 1992 and 1996, the average annual purchase of NID water for those properties was 2,677 acre-feet of water. It was calculated that following reclamation, the demand for irrigation would decrease by 314 acre-feet per year. Whether compared to the average irrigation applied to the mining areas, or to the average purchases of water by the Hoffman Ranch and Coon Creek Cattle Company, a reduction of 314 acre-feet per year would place irrigation demand below Teichert's pro rata share of NID water.

Water budgets were prepared for preproject and postproject conditions. The water budgets identified inflow from all sources and outflow from all sources. At the time these budgets were prepared, the reclamation plan called for the development of three lakes totaling 520 acres. The approved reclamation plan calls for two lakes totaling 345 acres. Under their worst case scenario, the water budgets demonstrate that in an average year there will be ample water for the property in its postproject condition.[3]

During the mining and reclamation portions of the project portions of the property undergoing mining will be withdrawn from agricultural use. This will result in a decrease in irrigation water applied to the property from preproject conditions. It was determined, through communication with NID, that NID has water supply available to meet all water demands for the project. NID would not be required to construct new diversions, other facilities, or seek to obtain additional appropriative water rights.

In light of these factors, the EIR sufficiently demonstrates sources of water for project and postproject needs. In fact, the trial court accepted that NID currently has sufficient water supply for all project needs. However, the EIR notes that NID cannot guarantee that it will always have sufficient water supplies to meet the demands of its customers. The trial court noted this fact in conjunction with its erroneous belief that Teichert's right to NID water was on a defeasible contract basis in finding the EIR insufficient.

Teichert asserts, and WPCARE concedes, that to be sufficient, an EIR need not identify a guaranteed source of water. We agree. No water supplier

---

[3] Evaporation from the lakes will result in the consumptive use of groundwater. This will not require the use of water from NID or other surface sources, but will draw water from the groundwater basin. Studies indicated that the groundwater draw would not adversely affect existing groundwater users, but has the potential to constrain or add to the cost of future development in areas near the project site. For this reason, the effect was conservatively classified as significant but unavoidable.

can guarantee an adequate supply of water in all circumstances. (See *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 703 [27 Cal.Rptr.3d 223].) If an EIR were required to identify a guaranteed source of water, then no EIR would ever be sufficient. The EIR identifies existing, available, and sufficient sources of water for the project and in that respect is sufficient.

The trial court also noted that water deliveries by NID could be cut back in drought conditions. If NID water supplies decreased during a drought the first cutbacks would occur in the sale of surplus water pursuant to contracts, since customers with pro rata rights have priority to NID water. If water supplies decreased to the point that NID could not supply the needs of its pro rata customers, then it would cut back deliveries on an individual basis depending on beneficial use. Uses such as orchards, golf courses and intensive agricultural uses would have a higher priority while gravel mining would have a lower priority.[4] The EIR notes that if water deliveries were curtailed in the event of a severe drought, such that plants die and lake levels fall, when water again becomes available Teichert will be required to comply with all mitigation measures, including remediation.

An EIR should compare the effects of a project with the actual conditions that exist in the area. (*Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317].) The possibility of a drought is the status quo. The land is now used for agricultural purposes. Teichert's extraction of groundwater is more than sufficient to support its mining operations and most of the water obtained from NID is to be used for agricultural purposes. If, as the result of a drought, NID cannot deliver sufficient water, the land will suffer. That will happen with or without the project. Absent a sufficient basis in the record to establish that the project would cause a drought, exacerbate the severity of a drought, or exacerbate the environmental consequences of a drought, and we find none, the EIR's discussion of the possibility of a drought is sufficient.

This case is inapposite to the authorities relied upon by WPCARE. For example, in *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 [55 Cal.Rptr.2d 625], the county approved a project for a large destination resort. The EIR for the project identified a source of water for the first phase but did not identify water sources for any other phases. Obtaining a new source of water for a project can have

---

[4] Teichert's mining and processing activity will consume only a small fraction of the water used on the property, and the dewatering extraction of ground water is sufficient for that purpose. Most of the water Teichert will obtain from NID will be used for agricultural purposes and would not share the low priority of its mining operations.

significant impacts outside the project area. For example, if a project obtained a right to divert water from a stream, the diversion could affect fish and wildlife, riparian habitats, and other users. The Court of Appeal concluded that while an EIR need not find a source of water, it must address the impact of supplying water to the project. (*Id.* at p. 205.) That decision hinged on the need to obtain new sources of water for the project area. In contrast, this case does not involve a need to obtain a new source of water. Teichert has identified existing and available sources of water that are sufficient to meet the project needs.

In *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715 [131 Cal.Rptr.2d 186], the county approved a residential and commercial project. The EIR for the project noted the need for water supplies and indicated water would be obtained from water supplies of the State Water Project (SWP). In its calculations, the EIR utilized water volumes the SWP was originally intended to deliver. However, the SWP had never been completed and there was a vast gap between the original intent and the actual water supplies available. The Court of Appeal found the EIR inadequate because "[t]he dream of water entitlements from the incomplete [SWP] is no substitute for the reality of actual water the SWP can deliver." (*Id.* at pp. 717–718.) In contrast, in this case Teichert has identified existing and available actual sources of water.

In *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859 [134 Cal.Rptr.2d 322], a water agency intended to significantly increase its diversion of water from the Russian River. At the same time there were proceedings before the Federal Energy Regulatory Commission (FERC), which could result in significant reductions of water discharged from the Eel River into the Russian River. Although the water agency was aware of the FERC proceedings, and even actively participated in those proceedings, the EIR for the diversion of water from the Russian River made no attempt to analyze the cumulative effects of both increased diversions and decreased discharges from the Eel River. Obviously this was insufficient and the court so held. (*Id.* at pp. 871–872.) In contrast, here there are no anticipated changes in the water supply sources identified in the EIR.

For these reasons, we conclude the EIR is adequate in its identification of water supplies available for project purposes. We conclude the record contains sufficient evidence to support the County's findings.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to defendants and real party in interest. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Butz, J., concurred.

A petition for a rehearing was denied December 11, 2006, and the opinion was modified to read as printed above.