Filed 11/15/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WASHOE MEADOWS COMMUNITY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEPARTMENT OF PARKS AND RECREATION et al.,<br><br>    Defendants and Appellants. | A145576<br><br>(Alameda County<br>Super. Ct. No. RG12619137) |

The environmental impact report (EIR) is the "heart" of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). (Cal. Code Regs., tit. 14, § 15003(a) [cited hereafter as Guidelines].) To ensure informed public participation in the CEQA process, agencies are required to circulate a draft EIR for public comment. The draft EIR in this case did not identify a proposed project, but described five very different alternative projects then under consideration. Consequently, the public was not provided with "an accurate, stable and finite" project description on which to comment. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192–193 (*County of Inyo*).) We affirm the trial court's order granting the petition for writ of mandate filed by respondent Washoe Meadows Community (Washoe), directing appellants the California Department of Parks and Recreation (the Department) and the California State Park and Recreation Commission (the Commission) to set aside their approvals of the "Upper Truckee River Restoration and Golf Course Reconfiguration Project." (Pub. Resources Code, § 21168.5.)

1

# I. BACKGROUND

The Department controls and maintains the State's park system and has the authority to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public." (Pub. Resources Code, §§ 5001, 5003.) The Commission is located within the Department (Pub. Resources Code, § 530) and has responsibility for establishing "general policies for the guidance of the director [of the Department] in the administration, protection, and development of the state park system" (Pub. Resources Code, § 539) and setting "comprehensive recreational policy" for the state (Pub. Resources Code, § 540).

In 1984, the State of California acquired 777 acres of land encompassing a 2.2-mile stretch of the Upper Truckee River in the southern section of the Lake Tahoe Basin. The parcel was divided into two units: 608 acres designated as Washoe Meadows State Park (State Park), whose purpose was to preserve and protect a wet meadow, plus acreage designated as the Lake Valley State Recreation Area (Recreation Area), to allow for the continuing operation of a preexisting golf course. The division was necessary because golf courses are not allowed in state parks. (See Pub. Resources Code, § 5019.53.)

Since at least the 1990's, erosion of the river bed of the Upper Truckee River has raised concerns about the habitat for wildlife, the maintenance of the water table, and the depositing of sediment into Lake Tahoe. Studies commenced in 2003 identified the portion of the river that runs through the State Park and Recreation Area as one of the two worst contributors to the sediment running into the lake. The layout of the golf course inside the Recreation Area was of concern because it had altered the course and flow of the river, which in turn contributed to a deterioration of the habitat and water quality.

CEQA review commenced on the "Upper Truckee River Restoration and Golf Course Reconfiguration Project," with the Department acting as the lead agency and the

2

Commission acting as a responsible agency.[1]  Public scoping was conducted after the issuance of a scoping notice identifying four alternatives for the project: Alternative 1, no project; Alternative 2, river restoration with reconfiguration of the 18-hole golf course; Alternative 3, river restoration with a nine-hole golf course; and Alternative 4, river stabilization with continuation of the existing 18-hole golf course.  Alternative 2, which would relocate some of the holes of the golf course to areas then inside the State Park and which would necessitate a corresponding adjustment in the State Park/Recreation Area boundary, was specified as the preferred alternative.

In August 2010, the Department prepared and circulated a draft environmental impact report (DEIR).  (Guidelines, §§ 15084–15088, 15120–15131.)[2]  The stated purpose of the proposed project was "to improve geomorphic processes, ecological functions, and habitat values of the Upper Truckee River within the study area, helping to reduce the river's discharge of nutrients and sediment that diminish Lake Tahoe's clarity while providing access to public recreation opportunities in the State Park and [Recreation Area]."  The DEIR described the four alternatives identified in the scoping process as well as a fifth alternative, Alternative 5, calling for the restoration of the ecosystem and the decommissioning of the golf course.  The DEIR did not identify a preferred alternative, stating: "Five alternatives are being considered and are analyzed at a comparable level of detail in the environmental document.  A preferred or proposed alternative has not yet been defined.  Following receipt and evaluation of public comments on the draft EIR/EIS/EIS, the lead agencies will determine which alternative

---

[1]  " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment."  (Pub. Resources Code, § 21067.)  " 'Responsible agency' means a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code, § 21069.)

[2]  Because of the involvement of federal and regional agencies in the project, the report also served as an environmental impact study (EIS) under the National Environmental Policy Act (NEPA) and the Tahoe Regional Planning Compact and Tahoe Regional Planning Agency Code of Ordinances.  (See Guidelines, § § 15170, 15220.)

or combinations of features from multiple alternatives will become the preferred alternative. A discussion of the decision will be included in the final EIR/EIS/EIS."

The DEIR analyzed each of the five alternatives in considerable detail. Information meetings, a public site tour, and a public open house were held, and a public review and comment period was provided. The review period was extended, public hearings were held in October 2010, and the public comment period closed on November 15, 2010.

In September 2011, the Department released the final environmental impact report (FEIR) for the project, in which it identified "[a] refined version of Alternative 2" (river restoration with reconfigured 18-hole golf course) as the proposed preferred alternative. The FEIR stated, "The Preferred Alternative plan is conceptual, and acreages have been modified from the description of Alternative 2 in the [DEIR] to further address public access issues, such as trail safety, as well as protection of sensitive resources and management considerations. The final design may reflect modifications to project features made as a result of the normal design refinement process. However, these modifications are not expected to substantially increase the intensity or severity of an impact or create a new significant impact. Minor modifications presented below do not require recirculation of the EIR [] because these modifications do not change any significance conclusions presented in the [DEIR]."

The FEIR stated that Alternative 2 had been chosen as the preferred alternative because: "It would allow room for geomorphic and ecological restoration of the river, while accommodating the continuation of an 18-hole golf course. [¶] It would minimize connectivity of the golf course and the river. [¶] It would minimize or avoid sensitive archeological sites and sensitive ecological habitat. [¶] It would maximize golf use of higher capability lands and minimize use of [stream environmental zone] lands. [¶] It would include trail alignments for nongolf use that connect to the existing trail network and provide for safe use and enjoyment by [State Park] and [Recreation Area] visitors."

The "Project Features" section of the FEIR explained, "The Preferred Alternative involves river ecosystem restoration with a reconfigured 18-hole regulation golf course.

4

The current 11,840-foot-long reach of the Upper Truckee River would be restored to 13,430 feet with additional floodplain area. Several golf course holes would be relocated to an area on the west side of the river that contains less sensitive land that is further from the river. This would also reduce the amount of [stream environmental zone]] and 100-year floodplain occupied by the golf course. . . . [¶] The boundaries between the [State Park] and the [Recreation Area] would be modified so that the [Recreation Area] would encompass the reconfigured golf course and the restored river would generally become part of the [State Park]. . . .The text and maps of the Lake Valley SRA General Plan would be amended to reflect management of the reconfigured golf course." The alteration of the boundaries between the State Park and the Recreation Area to accommodate the project would result in a net loss of about 40 acres from the State Park.

On January 23, 2012, the Department certified the adequacy of the FEIR and approved the preferred alternative described therein (the modified version of Alternative 2). The Commission adopted Resolution No. 3-2012, agreeing with the conclusions in the FEIR and approving the land classification adjustments necessary to accommodate the reconfiguration of the golf course as part of the project.[3]

Washoe filed a first amended petition for writ of mandate seeking to set aside the approval of the project based on the following alleged CEQA violations: (1) the DEIR did not contain an "accurate, finite and stable" project description; (2) the DEIR did not contain a reasonable range of alternatives to the project; (3) the CEQA findings adopted by the Department did not explain why a new, potentially feasible alternative proposed by Washoe was not considered; (4) the FEIR did not contain necessary details about the final design and layout of the golf course; (5) the DEIR did not contain an accurate or

---

[3] Parks initially approved the project in October 2011, but rescinded those approvals to remedy certain procedural defects. The validity of the October 2011 approvals, which were the subject of prior litigation by Washoe and culminated in an appeal to this Court on the issue of attorney fees, is not before us in the present appeal. (See *Washoe Meadows Community v. California Dept. of Parks and Recreation, et al.* (Dec. 30, 2014, A139197, A140041) [nonpub. opn.].)

5

complete description of the environmental setting affected by the project; (6) the FEIR did not contain adequate mitigation measures and improperly deferred certain mitigation measures.

The trial court granted the petition on four grounds: (1) the DEIR failed to identify a stable proposed project on which the public could comment because it set forth a range of alternatives without designating a preferred alternative; (2) the FEIR did not sufficiently explain why the preferred alternative was substantially the same as Alternative 2 in the DEIR; (3) the vegetation mapping in the FEIR differed from that included in the DEIR and required recirculation of the FEIR; (4) the FEIR's stated mitigation measures for protecting identified cultural sites (i.e., human remains and artifacts of Native Americans), as well as fens[4] and other wetlands, improperly deferred mitigation by failing to set a performance standard or commit to further environmental review. The Department and the Commission appeal, challenging each conclusion.

## II. DISCUSSION

Dispositive of this appeal is the DEIR's failure to provide the public with an accurate, stable and finite description of the project. Washoe argued the DEIR prejudicially impaired the public's ability to participate in the CEQA process by setting forth a range of five very different alternatives and by declining to identify a preferred alternative. The trial court agreed and so do we.

A. *General Principles and Standard of Review*

Informed public participation is essential to environmental review under CEQA. When an EIR is required, the lead agency must notify the responsible agencies, which may then do early public consultation, or scoping, to determine the scope and content of the information to be included. (Pub. Resources Code, § 21080.4; Guidelines, § 15082.) A draft EIR is then prepared and circulated for public comment and review. (Pub. Resources Code, § 21091; Guidelines, § 15087.) The review period must be at least 30

---

[4] According to a study submitted by the California Plant Society, fens are "peat-forming wetlands, supported by nearly constant groundwater inflow."

6

days, after which the lead agency must prepare written responses to the public comments and incorporate those responses and comments into a final EIR. (Pub. Resources Code, §§ 21091, subd. (d)(2), 21104, 21153; Guidelines, § 15088.) When significant information is added to the EIR, it must be recirculated for another round of public review and comment before the issuance of a final EIR. (Guidelines, §§ 15088.5, 15090.) An agency may, but is not required to, provide a comment period after the circulation of the final EIR. (Guidelines, § 15089, subd. (b).) If there are no significant changes, the agency holds a hearing and presumably approves the final EIR.

" ' "The EIR is the heart of CEQA" and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]' [Citation.] 'The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' ([Pub. Resources Code,] § 21061.) 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1045 (*Treasure Island*).)

In reviewing an agency's compliance with CEQA during the course of its legislative or quasi-legislative actions, the trial court's inquiry during a mandamus proceeding " 'shall extend only to whether there was a prejudicial abuse of discretion,' " which is established " 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens for Responsible Growth Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), citing Pub. Resources Code, § 21168.5.) "In evaluating an EIR for

CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Id.*, at p. 435.) When it is alleged a draft EIR is inadequate to " ' "apprise all interested parties of the true scope of the project," ' " the issue is one of law and no deference is given to the agency's determination. (See *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 82–83 (*CEBE*).)

On appeal, we review the agency's action rather than the trial court's ruling, applying the same standard as the trial court. (*Vineyard*, *supra*, 40 Cal.4th at p. 427.) "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Ibid.*)

B. *The Project Description Was Not "Accurate, Stable and Finite"*

A draft EIR must contain a project description, which must in turn include: "(a) The precise location and boundaries of the proposed project . . . on a detailed map, preferably topographic. . . . [¶] (b) A statement of the objectives sought by the proposed project . . . . [¶] (c) A general description of the project's technical, economic, and environmental characteristics . . . . [¶] (d) A statement briefly describing the intended uses of the EIR." (Guidelines, § 15124.) "A description of the project is an indispensable component of a valid EIR." (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898.)

"This court is among the many which have recognized that a project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading. [Citation.] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal i.e., the "no project" alternative[], and weigh other alternatives in the balance.' [Citation.]" (*Treasure Island*,

8

*supra*, 227 Cal.App.4th at p. 1052.)  " 'An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' "  (*Ibid*., citing *County of Inyo*, *supra*, 71 Cal.App.3d 185, 192–193.)

CEQA's requirement of an "accurate, stable and finite project" was first articulated in *County of Inyo*, *supra*, 71 Cal.App.3d 185, in which the court addressed the effect of fluctuating and inconsistent project descriptions in an EIR prepared by the Los Angeles city water department  regarding the extraction of subsurface water in the Owens Valley.  Although the EIR initially described the project as a 51-cubic-feet-per second increase in pumping water to supply the water used in the Owens Valley, other portions of the report analyzed a project of much greater scope, including higher rates of pumping and the installation of infrastructure needed to deliver water to Los Angeles.  (*Id*. at p. 189–190.)  The court acknowledged the EIR adequately described the broader project's environmental effects, meaning "the informative quality of the EIR [was] not affected by the ill-conceived, initial project description."  (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 197.)  However, "[t]he incessant shifts among different project descriptions do vitiate the city's EIR process as a vehicle for intelligent public participation."  (*Ibid*.)  The court accordingly failed to discharge a writ that had been issued at an earlier stage of the litigation, finding the EIR insufficient to satisfy the city's statutory duty under CEQA.  (*Id*. at p. 205.)  "A curtailed, enigmatic or unstable project description draws a red herring across the path of public input."  (*Id.* at p. 198.)

The case before us arises from a different scenario than *County of Inyo*, albeit one that is no less problematic.  Rather than providing inconsistent descriptions of the scope of the project at issue, the DEIR did not describe a project at all.  Instead, it presented five different alternatives for addressing the Upper Truckee River's contribution to the discharge of sediment into Lake Tahoe, and indicated that following a period for public comment, one of the alternatives, or a variation thereof, would be selected as the project.  As the trial court indicated in its statement of decision, "for a project to be stable, the DEIR, the FEIR, and the final approval must describe substantially the same project.  A DEIR that states the eventual proposed project will be somewhere in 'a reasonable range

of alternatives' is not describing a stable proposed project. A range of alternatives simply cannot be a stable proposed project." The DEIR in this case functioned more as a scoping plan under Guidelines section 15083, which should be formulated *before* completion of a draft EIR for the purpose of "identifying the range of actions, alternatives, mitigation measures, and significant effects to be analyzed in depth in an EIR and in eliminating from detailed study issues found not to be important." (Guidelines § 15083, subd. (a).)

In support of its argument that the DEIR was not misleading, the Department and the Commission point to that document's thorough analysis of the environmental effects of Alternative 2, a version of which was ultimately approved as the project. But as *County of Inyo* makes clear, the problem with an agency's failure to propose a stable project is not confined to "the informative quality of the EIR's environmental forecasts." (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 197.) Rather, inconsistencies in a project's description, or (as here) the failure to identify or select any project at all, impairs the public's right and ability to participate in the environmental review process. A description of a broad range of possible projects, rather than a preferred or actual project, presents the public with a moving target and requires a commenter to offer input on a wide range of alternatives that may not be in any way germane to the project ultimately approved. While there may be situations in which the presentation of a small number of closely-related alternatives would not present an undue burden on members of the public wishing to participate in the CEQA process, in this case the differences between the five alternative projects was vast, each creating a different footprint on public land. Each option created a different set of impacts, requiring different mitigation measures.[5]

---

[5]     One public comment to the DEIR stated: "An EIR also typically contains a preferred alternative. This EIR does not contain a preferred alternative, but the preferential text and detail of the analysis prevalent for alternative 2 in the EIR clearly favors alternative 2. . . .The lack of specifying alternative 2 in the draft EIR as the preferred alternative is irregular and at best misleading to the public and appears as if it is being used as a way to temper the public response to the draft EIR/EIS/EIS. If the State

"[W]hen an EIR contains unstable or shifting descriptions of the project, meaningful public participation is stultified." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 656 [project description in draft EIR regarding mine expansion was unstable and misleading because it suggested both that no increase in mine production was sought and that mine production would substantially increase if project was approved].)

The Department and the Commission argue this case is comparable to *Treasure Island*, *supra*, 227 Cal.App.4th 1036, in which the court rejected a challenge to the sufficiency of an EIR evaluating the proposed development of a former naval station on a man-made island in the San Francisco Bay. (*Id*. at p. 1043.) We are not persuaded. The project in *Treasure Island* was clearly identified as a new mixed-use community which would include residences, commercial space, parks, playgrounds, trails and open space; although the standards for this development were comprehensive, some details regarding the configuration and design of certain buildings had been left for further review. (*Id*., pp. 1044, 1053.) The court concluded that even if some of the details had not been decided upon when the EIR was approved, "the basic characteristics of the Project under consideration. . . remained accurate, stable and finite throughout the EIR process." (*Id*. at p. 1055.) The DEIR in this case was not simply lacking in details that could not be reasonably supplied as yet; rather, it failed to identify the project being proposed.

The Department and the Commission also note that when federal environmental review is conducted under NEPA, an EIS must specify a preferred alternative for a project only "if one or more exists." (40 C.F.R., § 1502.14, subdiv. (e).) They argue this provision allows an EIS to describe a range of alternatives in cases where the agency has not yet identified a preferred alternative, and urge us to construe CEQA in a similar fashion because nothing in CEQA expressly requires an agency to state a preferred alternative in a draft EIR. But even if the presentation of alternative projects can in some

Parks Department has no intention of moving forward with the project unless Alternative 2 was selected, this needs to be clearly stated in the EIR."

11

cases be an adequate project description for a draft EIS under NEPA, the five dramatically different projects in the DEIR did not constitute a stable project description under CEQA. While cases interpreting NEPA can be persuasive authority for interpreting CEQA (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 591), California courts will not follow NEPA precedent that is contrary to CEQA (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 121).

Although the failure to comply with CEQA's informational requirements does not require reversal unless the petitioner establishes prejudice (Pub. Resources Code, § 21005, subd. (b)), such prejudice is found " 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the goals of the EIR process.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) A deficiency in the EIR may be deemed prejudicial under this standard "regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (Pub. Resources Code, § 21005, subd. (a); see *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1021.) The presentation of five very different alternative projects in the DEIR without the designation of a stable project was an obstacle to informed public participation for the reasons previously discussed, even if we cannot say such input would have changed the project ultimately selected and approved. The trial court correctly granted Washoe's writ petition.

C. *Other Issues*

The Department and the Commission challenge the trial court's determinations that the FEIR should have been recirculated because (1) it did not adequately explain why the preferred alternative that was ultimately approved was substantially the same as Alternative 2 in the DEIR; and (2) the vegetation maps in the FEIR differed from those in the DEIR. (See Guidelines, § 15088.5.) These issues are moot in light of our conclusion that the approval of the FEIR must be vacated based on the inadequate project description in the DEIR. Accordingly, we do not address them on appeal. (See *CEBE*, *supra*, 184 Cal.App.4th at p. 101.)

12

We also decline to address the claim that the trial court erred in finding the Department had improperly deferred the formulation of mitigation measures with respect to Native American cultural sites and fens/wetlands in the project area. Should the Department proceed to circulate a revised version of the FEIR, it is entirely foreseeable that new or more comprehensive information will be developed on these important topics. (See *CEBE*, *supra*, 184 Cal.App.4th at p. 101.) Additionally, the record reflects that a "Project Update" was circulated by the Department on April 3, 2013, which is described as a " 'revised alternative in response to public input,' " and which "maintains the 18 hole regulation golf course but reduces the number of holes to be relocated to the west side of the river from 9 to 5 thus reducing project costs significantly. . . . [T]he controversial southwest 20 acres of the property have been removed from the property based on feedback from the public." The trial court properly concluded this update did not affect the adequacy of the project description in the FEIR, given that it post-dated that document, but the update does provide an additional reason to believe the mitigation measures found deficient by the trial court might be altered in any revised EIR. We are reluctant to address claims that may ultimately be rendered moot. (*Ibid*.)[6]

## III. DISPOSITION

The judgment is affirmed. Ordinary costs on appeal are awarded to respondent.

---

[6] A joint amicus curiae brief has been filed by the Center for Biological Diversity and the Sierra Club, and we have read and considered that brief. In addition to commenting on issues raised by the Department and the Commission on appeal, the amicus brief presents arguments not raised by the parties, namely, that the reclassification of state park land to accommodate a golf course would violate the Department's duty to preserve public land as well as the public trust doctrine. We decline to address these issues. As a general rule, an appellate court " ' " 'will consider only those questions properly raised by the appealing parties. Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations].' " ' " (*Lavie v. Proctor & Gamble Co.* (2003) 105 Cal.App.4th 496, 502.) Though a court has the discretion in some situations to consider new issues raised by an amicus, "we do not depart lightly from the general rule" (*id.* at p. 503) and will not do so here.

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.

(A145576)

14

Alameda County Superior Court, No. RG-12619137, Evelio M. Grillo, Judge.

Attorneys General, Kamala D. Harris and Xavier Beccara; Senior Assistant Attorneys General John A. Saurenman; Acting Supervising Deputy Attorneys General Jennifer W. Rosenfeld and Andrew M. Vogel; Deputy Attorney General, Wyatt E. Sloan-Tribe, counsel for Defendants and Appellants.

Aqua Terra Aeris Law Group, Jason Robert Flanders, Amanda M. Prasuhn for Plaintiff and Respondent.

John P. Rose, Aruna Prabhala for The Center for Biological Diversity and The Sierra Club as Amicus Curiae on behalf of Plaintiff and Respondent.