Filed 2/28/14  City of Petaluma v. County of Sonoma CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF PETALUMA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF SONOMA et al., <br><br> Defendants and Respondents. | A134559 <br><br> (Sonoma County <br> Super. Ct. No. SCV248948) |

In this action, plaintiffs City of Petaluma (the City), Petaluma River Council, and other organizations and individuals (collectively plaintiffs) challenge the decisions of the County of Sonoma (the County) and its Board of Supervisors and Planning Commission (collectively defendants) to certify an environmental impact report (EIR), rezone portions of the project site and make corresponding amendments to the County's General Plan and an area plan, and approve construction and operation of an asphalt plant.[1]  Plaintiffs

[1] The petitioners and plaintiffs named in the operative complaint were the City, Petaluma River Council, an unincorporated association, Madrone Audubon Society, a California nonprofit corporation, Friends of Shollenberger Park, an unincorporated association, Moms for Clean Air, an unincorporated association, Petaluma Tomorrow, an unincorporated association, David Keller, Andrew Packard, Ryan Phelan, Stewart Brand, and Marjorie Helm.  The named respondents and defendants were the County, the Board of Supervisors of the County of Sonoma, and the Planning Commission of the County of Sonoma.  The named real parties in interest and respondents were The Dutra Group, a California corporation, CSW/Stuber-Stroeh Engineering Group, Inc., a California corporation, Corto Meno Sand & Gravel, LLC, a California limited liability company, Peach Tree Terrace, a California general partnership, and Shamrock Materials, Inc., a California corporation.

1

appeal the judgment entered after the trial court denied their petition for writ of mandate and complaint for declaratory and injunctive relief.  They contend defendants' actions violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) and the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (Brown Act) and that the project conflicts with and violates the County's General Plan.  We affirm the trial court's judgment.

## I.  BACKGROUND

The County, as lead agency, published a draft EIR (DEIR) in January 2008 for the Dutra Haystack Landing Asphalt and Recycling Facility (the project).  The DEIR described the project as "construction and operation of an asphalt batch plant, an asphalt recycling area, and an aggregate materials off-loading, storage and distribution facility for Dutra Materials (aka The Dutra Group).  The proposal [originally] include[d] the construction and operation of new dock facilities within and adjacent to the Petaluma River for the receipt of barged aggregate materials, a conveyer and distribution system, stockpiled aggregate materials, sand and recycled asphalt and concrete, an asphalt mixing and loading facility, a portable asphalt and concrete recycling plant, and related office with truck scale."

The project site is located on three parcels (019-220-001, 019-230-022, and 019-230-023) totaling 38 acres, between Highway 101 on the west and the Petaluma River on the east.  Shamrock Materials, Inc. (Shamrock) occupies an adjacent parcel to the north.  Shamrock provides aggregate storage and distribution to the construction trade, and has a barge off-loading facility on the Petaluma river.  According to the DEIR, The Dutra Group (Dutra) had an existing temporary asphalt batch plant at another site, which it would relocate to the project site.

In approving the project in December 2010, the board certified a final EIR (FEIR), which consisted of the DEIR, responses to comments on the DEIR, and several other documents.  As approved in 2010, the project included amendments to the County's General Plan to designate two of the parcels Limited Industrial, and a use permit for the asphalt batch plant.  Five hundred thousand tons of aggregate materials and sand for the

plant were to be imported through the existing barge off-loading facility on the Petaluma River, rather than through the new dock facility originally proposed. The materials would then be brought to the plant by conveyor.  Until the conveyor was operational, for an interim period of no more than three years, these materials would be trucked to the site.[2]

Plaintiffs brought a petition for writ of mandate and complaint for declaratory and injunctive relief, challenging the County's approval of the project, and alleging procedural and substantive deficiencies in the administrative proceedings.  The trial court denied the petition.

## II. DISCUSSION

### A. Standard of Review

" 'An appellate court's review of the administrative record for legal error and substantive evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.  [Citations.]  We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations.' [Citation.]" (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 76 (*Madera*), overruled on another ground in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457 (*Neighbors for Smart Rail*).)

"When the inquiry into legal error involves an EIR, the question can be phrased generally as 'whether the EIR is sufficient as an information document.'  [Citation.] When the specific claim of legal error concerns an omission of required information from

_____

[2] As we will discuss below, the project underwent a number of changes during the environmental review process, among them the deletion of a proposed new barge dock on the Petaluma River to import aggregate materials; the extension of the proposed conveyor system to convey materials from an existing barge dock on neighboring property to the project site; and the use of trucks to import materials from the existing dock to the project site during construction of the new conveyor system.

3

the EIR, the plaintiff must demonstrate that (1) the EIR did not contain information required by law and (2) the omission precluded informed decisionmaking by the lead agency or informed participation by the public. [Citation.] These two elements constitute an abuse of discretion and prejudice, respectively, and together form reversible error." (*Madera*, *supra*, 199 Cal.App.4th at pp. 76–77.)

### B. General Plan Consistency

In approving the project, the County approved a general plan amendment to change the land use designation for two of the parcels at the project site (Assessor Parcels 019-320-022 and 019-320-023) from Limited Commercial to Limited Industrial, as well as a corresponding zoning change.[3] Plaintiffs contend this approval was inconsistent with two policies of the County's general plan.

Every city and county must adopt a " 'comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning.' (Gov. Code, § 65300.) The general plan has been aptly described as the 'constitution for all future developments' within the city or county. [Citations.] '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571.) "A zoning ordinance that conflicts with a general plan is invalid at the time it is passed." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 544.) Moreover, general plans must be internally consistent. (Gov. Code, § 65300.5; see also *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 732; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 156, 175–176.)

---

[3] According to the County's General Plan, "The 'Limited Industrial' land use category provides sites for development to meet service and employment needs where the range or scale of industrial uses is limited." This category includes asphalt plants.

4

In reviewing a claim that a project is inconsistent with a general plan, we are mindful "that no project could completely satisfy every policy stated in the [general plan], and that state law does not impose such a requirement. . . . Once a general plan is in place, it is the province of elected . . . officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the [officials] considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the . . . officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719–720 (*Sequoyah*); see also *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats League*).) In other words, " '[a] project is consistent with the general plan " 'if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' " [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be "compatible with" the objectives, policies, general land uses and programs specified in the general plan. [Citation.] ' [Citation.] [¶] A city's determination that a project is consistent with the city's general plan 'carries a strong presumption of regularity.' " (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 238 (*Clover Valley*).) In considering a general plan amendment, we are mindful that such an amendment is a legislative act, and our review "focuses on whether the Board acted arbitrarily, capriciously, or without any evidentiary basis." (*Environmental Council v. Board of Supervisors* (1982) 135 Cal.App.3d 428, 439–440.)

    1. *Development in Areas Subject to Flood*

Policy 2.4 of the general plan establishes several criteria that "must" be met before amending the plan to add a Limited Industrial designation. Among those is criterion number 5, under which: "*Lands shall not be in areas subject to flood*, fire, and

5

geologic hazards or in areas constrained by groundwater availability or septic suitability."[4]  (Italics added.)  The Board found specifically that the project site was not subject to these constraints, stating in part, "The area proposed for development of the asphalt plant is currently elevated . . . above the 100 year flood elevation . . . ."  Plaintiffs point out that the majority of the project site is in the Federal Emergency Management Agency's 100-year flood hazard zone as well as the County's flood hazard zone.  By definition, they argue, areas within a floodplain are subject to flood.

One of the environmental impacts the EIR identifies is that the project would "place within a 100-year flood hazard area structures which would impede or redirect flood flows."  The EIR notes, however, that, "[a]lthough the project site is located within the 100-year flood zone, *the elevation of the proposed processing facilities would be above the base flood elevation of 7 feet msl*.  Additionally, the base of the proposed aggregate storage stockpiles would also be above the base flood elevation.  *Therefore, the proposed facilities would not be expected to be flooded during the 100-year event*.  Although the proposed grading for the site would result in placement of fill within portions of the flood zone, excavation within the zone would occur as part of wetland

---

[4] Under an earlier version of the General Plan, which was in effect at the time the DEIR was prepared, this criterion provided that Limited Industrial "[l]ands shall not be in environmentally sensitive or hazardous areas."  The preparers of the DEIR noted that the proposed general plan amendment would include land that was in an environmentally sensitive area and that was subject to floods and seismic hazards, and noted that the mitigation measures did not all "involve avoidance of the environmentally sensitive and hazardous areas, which appears to be the intent of Criterion #5."  The preparers of the DEIR concluded this impact was significant and unavoidable.  The County later found that the general plan amendment was consistent with the goals, objectives, and policies of the general plan.  We reject plaintiffs' contention that the County was bound by the conclusions of the DEIR.  For one thing, the DEIR considered a different general plan provision than was in effect at the time of project approval.  In any case, the authority plaintiffs cite stands for the proposition that an earlier version of an initial study may provide evidence to support a fair argument that a project may have a significant effect on the environment.  (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 152–154.)  It does not persuade us that a county is bound by the conclusions of the preparers of the DEIR on the ultimate question of whether a project is consistent with the county's unamended general plan.

6

enhancement.  Analysis prepared for the project indicates that the proposed project would increase the flood storage volume below elevation 7 feet msl [mean sea level] from 28.57 acre-feet (existing) to 32.53 acre-feet.  The increases in flood storage would be expected to incrementally reduce flood hazards within the Petaluma River by retaining more water on-site during flooding events." (Italics added.)  The EIR thus concluded that changes to flood hazard conditions would be less than significant.

In approving the project, the County found impacts from conflicts with land use plans, policies, and regulations to be less than significant. As pertinent here, the County agreed with the EIR, and concluded that "[t]he area proposed for development of the asphalt plant is currently elevated (around 10 feet above mean sea level) above the 100 year flood elevation (7 feet above mean sea level)" and therefore met the criteria for an amendment to the General Plan designation to Limited Industrial.

Plaintiffs contend this finding was improper because, even if the portion of the parcels to be developed would be above the flood level, other portions of the rezoned parcels would remain below that level, particularly "Area D," a portion of Parcel 019-320-022, which was to be preserved and restored as open space.  As we have noted, a project is consistent with a general plan " ' " 'if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment,' " ' " even if it is not "in perfect conformity with each and every general plan policy." (*Clover Valley*, *supra*, 197 Cal.App.4th at p. 238.)

As plaintiffs point out, a public entity's flexibility in interpreting its own general plan is not limitless, and "[a] project is inconsistent if it conflicts with a general plan policy that is fundamental, mandatory, and clear." (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at p. 782.)  In *Endangered Habitats League*, the court ordered a county's approval of a project to be set aside where the project was inconsistent with the county's general plan in three ways.  First, it would cause an unacceptable increase in traffic on a local road when measured using the methodology specified in the general plan. (*Endangered Habitats League*, *supra*, 131 Cal.App.4th at pp. 783–784.)  Second, a specific plan amendment allowing regulations to be "balanced," conflicted with the

general plan policy that new developments must comply with *all* specific plan policies in order to maintain a buffer between urban development and a national forest. (*Id*. at pp. 785, 787.) Finally, the amendment exempted the project from otherwise mandatory, more stringent, specific plan requirements regarding tree preservation, grading, and open space, in violation of the general plan policy that all new development comply with all specific plan policies. (*Id*. at pp. 785–787, 789.)

In the second case on which plaintiffs rely, *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332 (*Families Unafraid*), the court concluded a project was inconsistent with a county's general plan's policies that required land designated low-density residential to be contiguous to the community regions (larger towns or areas of development) or rural centers (smaller towns or areas of development), and that required low-density residential lands not to be separated from these areas by rural residential land-use designations. (*Id*. at pp. 1338–1339, 1341.) The court reasoned, "the land use policy at issue here is fundamental (a policy of contiguous development, and the Draft General Plan states that the 'Land Use Element is directly related to all other elements contained within the General Plan'); the policy is also mandatory and anything but amorphous . . . . [¶] Moreover [the development's] inconsistency with this fundamental, mandatory and specific land use policy is clear— this is not an issue of conflicting evidence." (*Id*. at pp. 1341–1342.)

Thus, in both *Families Unafraid* and *Endangered Habitats League*, the projects undermined the general plans' fundamental land use policies. Here, on the other hand, the area to be developed would be above flood level, and the excavation would *increase* flood storage on-site and thereby reduce flood hazards within the Petaluma River.

Nor have plaintiffs convinced us that the General Plan's prohibition on Limited Industrial zoning in areas subject to flood is a "fundamental" policy, where the areas of the property that will actually be developed lie above the flood level and flood storage as a whole will be increased. On the facts of this case, the Board could reasonably conclude the project, would not violate a "fundamental, mandatory, and clear" general plan policy related to flooding.

8

We also are not convinced by plaintiff's argument that if the project does not go forward, any subsequent purchaser of the property would be allowed to develop it in any way permitted in the Limited Industrial zone despite the potential for flooding. Any such development would, of course, be subject to any necessary review of its environmental effects and its consistency with applicable general and area plans.

Plaintiff argues, however, that some of the area to be developed had not yet been filled to above the flood level at the time of project approval, and that the County therefore could not properly designate the property light industrial. The County found that the area proposed for development of the plan "*is* elevated above the 100-year flood elevation," (italics added) and the record contains evidence that this area was already elevated to that level. In any case, even if the filling was not yet complete, it is clear that it will take place as part of the project, and we reject plaintiff's contention that the project is therefore inconsistent with the general plan.

### 2. *River Dependent Uses*

The portion of the General Plan's Land Use Element that considers Petaluma and its environs includes several objectives, including making Petaluma the commercial and industrial center for the area. (Objective LU-19.2.) Among the policies to be used to achieve these objectives is the following: "Policy LU-19c: Apply the 'General Commercial' and 'General Industrial' categories only to appropriate uses existing as of 1986 inside the Urban Service Boundary. Apply the 'Limited Commercial' and 'Limited Industrial' categories only to appropriate uses existing as of 1986. *However, consider additional river dependent commercial and industrial uses along the Petaluma River, where necessary to maintain the river as a navigable waterway connecting the Bay to downtown Petaluma.*" (Italics added.)

The County found the project was consistent with these policies in that it "includes the delivery of aggregates and sand from an existing adjacent barge off-loading facility on Landing Way, and will maintain a link between the new facility and the Petaluma River. The Board finds that the Proposed Project is river dependent because the approved conveyor provides a permanent, fixed connection to river importation that must

9

be in close proximity to the river. The Board further finds that having a long-term, high-volume customer connected with a fixed conveyor system increases the likelihood that significant river-based aggregate importation will continue into the future, and the Proposed Project is thus necessary to maintain the river as a navigable waterway."

The EIR explains that "[t]he Petaluma River is actually a tidewater slough that was designated a river in 1959 by Congress, which allowed the Army Corps of Engineers (Corps) to permit dredging for commercial navigability access." It also explains that dredging occurs approximately every four years. However, as of 2010, the Corps classified the river as "a shallow draft waterway with low commercial use," and had not dredged it since fiscal year 2003. The Corps explained in a letter to a County employee that "while there is no action being taken to de-Authorize the Petaluma River channel from the list of federally-maintained navigation channels, Federal projects with this classification are low on the national priority list for fiscal year Appropriations." Water dependent industries along the riverfront formed part of the economic justification for the Corps to dredge the river.

As approved, the project does not include any new barge docking facilities or off-loading equipment along the Petaluma River. Rather, sand and aggregates would be transported to the asphalt plant from an existing facility, Shamrock's Landing Way Depot, which imports materials from the river by barge. For the first three years (during which the conveyor would be constructed) trucks would carry materials from the Landing Way site to the asphalt plant. Thereafter, the new conveyor would carry materials from the Landing Way Depot to the asphalt plant. A County staff report opined that the conveyor option "provides a permanent, fixed connection to river importation that must be in close proximity to the river and is therefore considered to be river-dependent."

Plaintiffs contend the Board abused its discretion in finding the project fell within Policy LU-19c's provision that the County could consider the Limited Industrial category for "river dependent" industrial uses that did not exist as of 1986. They argue that for the three years that trucks are used to carry materials from the Landing Way Depot, the project will not be river dependent because it will have no direct connection to the river.

Plaintiffs acknowledge that under the conditions of approval, the project will not continue if the conveyor system is not constructed after three years; however, they contend, there is no evidence that Dutra will in fact be able to construct a conveyor system to Shamrock's facility, and Shamrock has disclaimed any interest in the project. If the conveyor system is not built, they argue, the project site will still retain its designation as Limited Industrial, and this will violate the General Plan's Policy LU-19c.

As we have already explained, a public entity's finding that a project is consistent with its general plan is entitled to a strong presumption of regularity. (*Clover Valley*, *supra*, 197 Cal.App.4th at p. 238.) The applicable policy—that the County "consider additional river dependent . . . industrial uses along the Petaluma River, where necessary to maintain the river as a navigable waterway connecting the Bay to downtown Petaluma"—by its nature vests discretion in the Board to determine whether a given project is river dependent, and whether it will assist in maintaining the river as a navigable waterway. There is conflicting evidence of whether the project would in fact rely on the Petaluma River, and we will not reweigh that evidence. (See *Sequoyah*, *supra*, 23 Cal.App.4th at p. 720.) We conclude that it was within the County's discretion to find that the project as a whole—including a limited period of trucking materials from a depot on the river, followed by importing materials from the depot by a permanent, fixed conveyor system—was river dependent for purposes of the general plan.

## C. Baseline Conditions

The notice of preparation (NOP) for the Dutra project was published on February 17, 2006. The EIR explained that Dutra had previously operated an asphalt plant for 20 years and was currently operating its facility at another site, 1601 Petaluma Boulevard South, under a temporary permit that would expire in 2008.[5] The project would involve relocating the temporary asphalt batch plant to the project site at 3355 Petaluma

---

[5] It appears that the applicant had sold the property and its lease had expired with no possibility of an extension, and that operations at the temporary facility ceased in September 2007.

11

Boulevard South. It appears that the project site is between one-half mile and one mile away from the site of the temporary plant.

In its discussion of air quality impacts, the EIR explained that "[b]ecause the project involves the relocation and shutdown of the existing asphalt facility, the impact is evaluated based on the net increase in emissions due to construction and operation of the new facility." Plaintiffs contend it was improper for the EIR to base its analysis on the difference between the new plant's anticipated emissions and the emissions of the existing plant. Rather, they argue, since the existing facility was scheduled to cease operations in 2008, the EIR should not have included emissions from that facility in its baseline.

The State CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines))[6] require an EIR to "include a description of the physical environmental conditions in the vicinity of the project, *as they exist at the time the notice of preparation is published*, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will *normally constitute the baseline physical conditions* by which a lead agency determines whether an impact is significant." (Guidelines, § 15125(a), italics added.) The Guidelines also provide that "[i]n assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they existed at the time the notice of preparation is published, or where no notice of preparation is published, at the time environmental analysis is commenced." (Guidelines, § 15126.2, subd. (a); see also *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952.) The Guidelines also require an EIR to evaluate a "no project" alternative, and provide,

---

[6] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 (*Vineyard*).)

12

"[t]he no project alternative analysis is not the baseline for determining whether the proposed project's environmental impacts may be significant, unless it is identical to the existing environmental setting analysis which does establish that baseline (see Section 15125)." (Guidelines, § 15126.6, subd. (e)(1).)

"[A]n inappropriate baseline may skew the environmental analysis flowing from it, resulting in an EIR that fails to comply with CEQA." (*Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 557 (*Citizens for East Shore Parks*); see also *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87.) An agency has discretion to decide how existing physical conditions can best be measured, subject to review for substantial evidence. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328 (*Communities*).)

Plaintiffs in essence contend the County abused its discretion in failing to use conditions that would exist *after* the time of the NOP as the baseline for evaluating the project's effects on air quality. The court in *Citizens for East Shore Parks* considered a similar contention. There, the State Lands Commission approved a lease for the applicant, Chevron U.S.A. Inc., to continue operating a marine terminal. (*Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 553–554.) The EIR used a baseline that reflected the current condition of the terminal, and—in an argument similar to the one plaintiffs make here—the project opponents contended the baseline should have excluded any operational use of the terminal, because the agency could have eliminated the current conditions by refusing the renewal. (*Id*. at pp. 558, 560.) The Court of Appeal rejected this argument, noting that under the CEQA Guidelines, the environmental setting at the time of the NOP normally constituted the baseline. (*Id*. at p. 561.)

More recently, our Supreme Court addressed the question of whether an agency has discretion to use projected future conditions, rather than existing conditions, as a baseline. In *Neighbors for Smart Rail*, an EIR for a project had exclusively employed an analytic baseline of conditions in the year 2030 to assess a project's likely impacts on traffic congestion and air quality. (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 445.) After reviewing appellate authority on the propriety of using future conditions as

13

a sole baseline, the court announced the following rule:  "Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions—a departure from the norm stated in Guidelines section 15125(a)—is justified by unusual aspects of the project or the surrounding conditions.  That the future conditions analysis would be informative is insufficient, but an agency does have discretion to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would detract from an EIR's effectiveness as an informational document, either because an analysis based on existing conditions would be uninformative or because it would be misleading to decision makers and the public."  (*Neighbors,* at pp. 451–452; see also *id*. at p. 457.)

Thus, in appropriate circumstances an agency may "adjust its existing conditions baseline to account for a major change in environmental conditions that is expected to occur before project implementation.  In so adjusting its existing conditions baseline, an agency exercises its discretion on how best to define such a baseline under the circumstances of rapidly changing environmental conditions."  (*Neighbors for Smart Rail,* at p. 452.)  For example, the court went on: "in an EIR for a new office building, the analysis of impacts on sunlight and views in the surrounding neighborhood might reasonably take account of a larger tower already under construction on an adjacent site at the time of EIR preparation."  (*Id*. at p. 453.)  The court also noted that an agency's determination that an existing conditions impact would provide little or no relevant information or would be misleading as to a project's true impacts is reviewed for substantial evidence.  (*Id*. at p. 457.)

Thus, while *Neighbors for Smart Rail* recognizes the *discretion* of an agency to include projected future conditions in a baseline in unusual circumstances, it does not change the usual rule, expressed in the Guidelines section 15125, subdivision (a), that baseline conditions are normally the physical conditions that exist at the time the NOP is published.  Whether or not the County could permissibly have exercised its discretion to use other conditions as the baseline, an issue we do not decide, nothing in *Neighbors for Smart Rail* leads to the conclusion that the County was *required* here to depart from the

14

usual rule. In light of the clear directive of the Guidelines and the decisions in *Neighbors for Smart Rail* and *Citizens for East Store Parks*, we reject the contention that the County violated CEQA by using conditions at the time the NOP was published as the baseline for air quality impacts.

Plaintiffs attempt to distinguish *Citizens for East Shore Parks* on the grounds that the project here will be located on a different site, and that the existing facility would necessarily shut down. We are not persuaded that a project that involves the relocation of a plant—even after an interim closure—takes this case outside the usual rule that baseline conditions are measured at the time of the NOP.

Plaintiffs argue, however, that it was inappropriate to include the emissions from the temporary plant in the baseline because the effects of certain pollutants—namely $PM_{10}$ and reactive organic gasses (ROGs)—are localized. Because the project site was between one-half mile and one mile from the temporary plant, plaintiffs argue, it was illusory for the impact analysis to assume those localized pollutants existed at the site of the proposed new plant. They contend "[i]t defies reality that PM10 and ROGs emissions half-mile away would accurately reflect the adverse impact of those emissions on the residents living 300-feet downwind of the proposed Project site."

However, the County points out that this contention does not appear to have been raised at the administrative level. Public Resources Code section 21177, subdivision (a), provides: "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." Under this rule, " '[w]hen a ground for noncompliance with CEQA was not raised during the comment period or during the public hearing on project approval, the right to raise the issue in a subsequent legal action is waived. The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.] "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate

15

and respond to them" [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.' " (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 250; see also *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 794.)

Responding to the County's assertion that the issue of localized impacts of $PM_{10}$ and ROG had been raised for the first time on appeal, plaintiffs point in their reply brief only to their briefing in the trial court. In doing so, they fail to meet their burden to show the issue was raised at the administrative level. Our own review of the administrative record shows that plaintiffs and their consultants submitted comments contending that because the project was "an entirely new facility on a new parcel of property," the project was not a modification of an existing project and the baseline should therefore be zero; and that as a result of including emissions from the temporary plant in the baseline, the EIR failed to identify impacts due to emissions of ROGs, nitrogen oxides, and $PM_{10}$. However, these comments fail to make the point that certain substances, namely ROGs and $PM_{10}$, have a particularly localized impact that the EIR should have taken into account in setting its baseline. Nor is there any indication plaintiffs drew the County's attention to any air quality effects that would be different at the location of the new plant than at the temporary plant less than a mile away.

**D. Changes to Project During Environmental Review**

*1. Background*

As we have already noted, certain aspects of the project changed during the environmental review process. The project as originally described in the January 2008 DEIR included the construction of "a barge facility on a fixed pier in and along the edge of the Petaluma River to accommodate off-loading of aggregate materials for asphalt production." An enclosed conveyor system would carry the material approximately 940 feet over areas A and B before stockpiling it in Area C, the main operational area of the project.

16

After a number of hearings before the Board and the Planning Commission—and after the FEIR had been presented—Dutra asked the Board to allow it to revise the original project to address concerns that had been raised regarding noise, air emissions, and aesthetic impacts. Dutra then proposed a revised project (Revised Project I), which would reduce peak production by 25 percent, from 400 tons per hour to 300 tons per hour; reduce the height of the silos at the project site from 76 feet to 62 feet, and eliminate on-site crushing of recycled materials.

The United States Coast Guard later determined that the barges moored at the facility would intrude into the federally maintained navigation channel and create a navigational hazard to other users. In response, Dutra proposed a second revision to the project (Revised Project II). In a staff memorandum to the Board prepared for an October 12, 2010 hearing, Steve Padovan of the County's Permit and Resource Management Department explained that Revised Project II had been received by staff in three letters, dated January 29, 2010, April 8, 2010, and June 10, 2010. Revised Project II involved several changes from the original project: in addition to the changes already discussed as part of Revised Project I, Revised Project II would include importation of up to 500,000 tons annually of sand and aggregates from the existing Landing Way Depot by truck and/or a conveyor system.[7] The memorandum described this as the "most substantial change" included in Revised Project II.

The staff memorandum explained, "[T]he proposed trucking route for materials would consist of a short haul west on Landing Way, turning south on Petaluma Boulevard South, left into the proposed facility and then returning back in the opposite direction. If a conveyor system is utilized, the project would extend the originally proposed conveyor that linked the facility to the river parcel (Area A) approximately 815 feet northward up to the existing barge off-loading facilities at Landing Way Depot. The conveyor extension would be constructed a few feet above grade and parallel to the

---

[7] Revised Project II also included a number of other changes: raising the pad elevation of a portion of Area C of the project site, reconfiguring certain project components, and redesigning a sound wall.

Petaluma River, over previously designated wetlands on the Landing Way Depot site, to a joint use hopper that would serve both facilities. All off-loading, trucking and conveyor operations for the new facility would be subject to the same hourly and seasonal restrictions as those indicated in the Draft EIR, Response to Comments Document and in Landing Way Depot's existing Use Permit []. . . . Staff has . . . assumed that under the conveyor option, materials would have to be trucked for an interim period as the conveyor requires obtaining some type of easement over the SMART railroad tracks which could delay construction. The interim trucking period proposed by staff is for three years."

The staff memorandum concluded, and the Board found, that Revised Project II "would not result in any new significant impacts, any substantial increase in the severity of any previously-identified significant impacts, any new, feasible alternatives or mitigation measures that [Dutra] declines to adopt, nor otherwise trigger recirculation" of the EIR under CEQA Guideline section 15088.5. Instead, the Board found, Revised Project II would "result in fewer significant unavoidable impacts and significantly reduced adverse impacts overall as compared with the Original Project."[8]

Three of the potential impacts of Revised Project II are important to our review of this case. First, the memorandum reported that Dutra's consultant had found that the construction of the extended conveyor system would affect a .48 acre wetland mitigation area on the Landing Way Depot site, an impact that was considered potentially significant absent mitigation. However, the wetland area was of poor quality, and only a small portion of it would be filled. Dutra's wetland specialist proposed mitigating the impact through the purchase of mitigation credits at a wetland bank, about four miles from the site, that had been authorized by state and federal resource agencies to provide in-kind mitigation credit for local projects. The staff concluded that decommissioning the

_____

[8] The Board concluded the revisions would reduce the project's impacts on aesthetics, air pollution, biological resources, hydrology and water quality, noise, and transportation and traffic, particularly with the adoption of the conveyor option.

18

wetlands and securing credits at the wetland bank would mitigate the effects on wetlands to a less-than-significant level.

Second, Revised Project II could include truck traffic that was not part of the original project or Revised Project I. The staff memorandum reported that the DEIR's consultant on air quality, BASELINE, had evaluated Dutra's studies, the DEIR and responses to comments, and information provided by Dutra, staff, and the truck engineer on truck trips and site operations. The memorandum explained, "If the conveyor option is utilized, there will be only minimal impacts to air quality from dust as the material is conveyed and in the form of added GHGs [greenhouse gas] due to the production of electricity to power the conveyor. However, the trucking operation will result in 43,478 additional truck trips per year (500,000 tons/23 tons per truck x 2)." The memorandum noted that Dutra had provided several studies evaluating the changes to air quality impacts that would result from Revised Project II.

An independent evaluation of Dutra's studies, carried out by BASELINE, showed that, "[u]nder the conveyor option, there are additional PM10 emissions not quantified in the DEIR. If the conveyor system has no dust suppression equipment, then an additional 3.3 pounds of PM10 per day, or 0.28 tons per year would be produced. If sprayers are used, PM10 emissions would be reduced to an estimated 0.14 pounds per day, or 0.011 tons per year. Based on the mitigation measures in the DEIR, sprayers would be required. Furthermore, due to noise issues the conveyor will be enclosed. Indirect GHG emission from the conveyor system would be approximately 24 tons of $CO_2$eq annually, assuming a 60 horse-power electrical motor would be required to run the conveyor system. [¶] With regard to the trucking option, additional emissions of PM10, ROG, NOx, and CO will be produced from the trucks transporting the raw materials the one-half mile distance to the facility from the Landing Way Depot. These trucks would emit an estimated 1.2 tons of PM10 (0.015 tons from vehicle exhaust and 1.2 tons from road dust), 0.026 tons of ROG, 0.38 tons of NOx, and 0.11 tons of CO per year." Using what it characterized as a conservative approach, the memorandum reported that "the Revised Project II, under the conveyor option, would result in a reduction in emissions relative to

19

the first revised project (which was an estimated 19 to 30% reduction in emissions from the Original Project).  Under the trucking option, the PM10 and CO numbers would increase but still remain under the thresholds established by the Air District."  The memorandum went on, "Excess cancer risk would not increase with the conveyor option but may increase with the trucking option, remaining below the BAAQMD significance threshold in either case.  Cumulative impacts would also be reduced with the conveyor option as materials would be transported to the project site using electric machinery. [¶] Under either option, NOx emissions would remain significant and unavoidable but the emissions would not violate any adopted thresholds.  Significant cumulative effects discussed in the DEIR would remain significant and unavoidable."

Third, as to the effects of the additional truck trips on traffic, the staff memorandum reported:  "The Revised Project II, with the elimination of all barge operations on Area A, substantially alters how materials are delivered to the site.  Up to 500,000 tons per year of materials will now be imported from the Landing Way Depot facility either by truck or conveyor.  Under the conveyor option, the total number of truck trips will remain the same as under the first revised project (101,304 trips).  However, under the trucking option, the total number of truck trips will increase to 144,782 or 16% more than was projected in the Original Project in the DEIR [].  Truck transfer of import materials would consist of trucks exiting onto Petaluma Boulevard South at the Landing Way Depot driveway traveling south to the Dutra Haystack Landing driveway and returning.  The present analysis treats this flow of traffic as added traffic above any entitlement already accounted for in the Landing Way Depot Mitigated Negative Declaration dated June 17, 2004."

The original traffic consultant for the DEIR, Dowling Associates, analyzed the traffic impacts of Revised Project II.  Dowling found that under anticipated conditions for 2010 in addition to Revised Project II, the level of service (LOS) at the intersection of Petaluma Boulevard South and Landing Way would fall from LOS E to F during the

20

morning peak hour.[9]  The staff memorandum concluded that the installation of a signal at the intersection of Petaluma Boulevard South and Landing Way would mitigate the impact, and that with the mitigation, the intersection would have a morning LOS of D, and an afternoon LOS of C.  Dutra would be required to install the signal before beginning operations.  Dutra would also be required to provide a fair share toward providing a right turn lane which would reduce the delay at the intersection of Petaluma Boulevard and the northbound ramp to US highway 101; as a result of this measure, traffic conditions would be better than under the conditions analyzed in the DEIR.

In certifying the FEIR and approving the project, the County found that the revisions to the project would not result in any new or substantially more severe environmental impacts, any new, feasible mitigation measures or alternatives that the applicant declined to adopt, or otherwise trigger recirculation of the FEIR.  Rather, the county found, the Revised Project II would result in reduced environmental impacts.

   2.  *Accurate and Stable Project Description*

Plaintiffs contend that the above-described changes to the project after the EIR had been circulated were extensive enough that the EIR lacked an accurate and stable project description.  "The Guidelines specify that every EIR must set forth a project description that is sufficient to allow an adequate evaluation and review of the environmental impact. (Guidelines, § 15124.)  . . . [¶] '[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.'  . . . '[O]nly through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . .' "  (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654–655.)  However, "[t]he CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial

_____

[9] The EIR explains that "[f]acilities that operate at LOS E or worse are considered deficient."

21

project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 (*County of Inyo*); see also *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 736.)

Plaintiffs contend the EIR does not meet these standards because it fails to describe significant aspects of the project, particularly the extension of the conveyor system and the temporary truck traffic as a result of the use of the existing Shamrock barge dock to replace the proposed construction of a new barge dock closer to the asphalt plant. In fact, they point out, the EIR states that an alternative to use the Shamrock barge dock was considered and rejected as infeasible after Shamrock indicated that its facility had no excess capacity available for asphalt aggregate. Thus, they argue, "a member of the public reading the EIR would reasonably assume that the Shamrock barge dock alternative was rejected."

The court in *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898–899 (*Western Placer*) discussed the effect of changes to a project during the environmental review process. The applicant there proposed a project to mine and process sand, gravel, and granite, with mining and reclamation to occur in nine successive phases. (*Id*. at p. 893.) Some of the land was covered by California Land Conservation Act of 1965 (Williamson Act) contracts that prohibited mining. (*Id*. at p. 894.) After the DEIR and a revised DEIR were circulated, the developer met with county staff and proposed to implement one of the project alternatives, but with a change in the phasing of the project that allowed it to avoid mining on lands affected by Williamson Act contracts until the contract expired. (*Ibid*.) The FEIR mentioned that the project could avoid Williamson Act conflicts by delaying mining on lands affected by the contracts, but did not include a revised description of the project reflecting the new phasing or analyze whether the change in phasing created additional impacts. (*Ibid*.) The county certified the FEIR and approved the revised project, and the trial court granted a writ of mandate, concluding the EIR had to be

revised to include the changes made to the project before the county decided whether the changes were significant enough to require recirculation. (*Id*. at pp. 895, 899.)

The Court of Appeal reversed the judgment, reasoning, "The parties have directed us to no provision in CEQA or the Guidelines, and we have found none, that requires all changes made to a project after the final EIR is released but prior to certification to be included in the EIR. [¶] The closest CEQA comes to addressing this issue is when it discusses the requirement to recirculate an EIR. The relevant provision of CEQA, section 21092.1, reads in part: 'When significant new information is added to an environmental impact report after notice has been given pursuant to Section 21092 [notice of availability of DEIR for public review] and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report.' (Pub. Resources Code, § 21092.1.)" (*Western Placer*, *supra*, 144 Cal.App.4th at p. 899; see also *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 131 [if lead agency adds " 'significant new information' " to EIR after review, it must recirculate revised EIR]; *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1146–1147.)

The court in *Western Placer* then reviewed the Guidelines on recirculation, and explained that the statute and Guidelines "explain what to do when significant information is added to an EIR, but they do not address whether an agency must add all information to an EIR before determining whether the information is significant and triggers recirculation." (*Western Placer*, *supra*, 144 Cal.App.4th at p. 900.) After reviewing the case law, the court concluded, "CEQA does not require a lead agency to revise a final EIR to include any new information or project changes that arise after the EIR is released but prior to certification before the agency determines whether the information is significant enough to require the EIR to be recirculated." (*Id.* at p. 903.) Moreover, the county's determination that the new phasing was not significant new information requiring revision and recirculation of the EIR was given substantial

23

deference, and the challenger bore the burden of showing substantial evidence did not support the determination. (*Ibid*.) Under *Western Placer*, we conclude the County was not required to revise the EIR based on the changes to the project before determining whether the new information was significant and required recirculation.

The two principal cases relied on by plaintiffs are inapposite. In *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1208, an EIR failed to discuss why it had been determined that urban decay was not a significant effect of the proposed project. In *Russian Hill Improvement Assn. v Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 167–168, no EIR was prepared for a project, and the public entity made a post hoc effort to treat a collection of reports and hearings as the equivalent of an EIR. Neither case concerned a project that underwent changes due to concerns raised during the environmental review process, after circulation of the EIR.

But, we still must address the question of whether the changes to the project constituted significant, new information that required the County to revise and recirculate the EIR. As we have explained, the County's decision not to do so is entitled to substantial deference, and plaintiffs bear the burden of showing it is not supported by substantial evidence. (*Western Placer*, *supra*, 144 Cal.App.4th at p. 903; see also *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 655–656 [recirculation unnecessary because substantial evidence supported determination that new alternative added to FEIR was not feasible].) The Guidelines provide that recirculation is required where "significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review under Section 51087 but before certification. As used in this section, 'information' can include changes in the project or environmental setting as well as additional data or other information. New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement. 'Significant new information'

24

requiring recirculation include, for example, a disclosure showing that: [¶] (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it. [¶] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a).) As our Supreme Court has explained, recirculation is not mandated "when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment. [Citation.] . . . [T]he lead agency's determination that a newly disclosed impact is not 'significant' so as to warrant recirculation is reviewed only for support by substantial evidence." (*Vineyard*, *supra*, 40 Cal.4th at p. 447.)

Plaintiffs first point to Revised Project II's effects on traffic. The DEIR had discussed "Intersection Level of Service Impacts" and concluded that although the project would affect the LOS at various intersections, including Petaluma Boulevard South at Landing Way, the impact was less than significant and did not require mitigation. The staff memorandum on Revised Project II reported that during the three-year period when material would be imported from the Shamrock barge dock to the asphalt plant by truck, the effects on traffic and the intersection of Petaluma Boulevard South and Landing Way under 2012 conditions would be significant without mitigation, but that the addition of a traffic signal at that intersection would mitigate the project's impacts. Plaintiffs do not argue substantial evidence does not support this conclusion, but instead contend that even if mitigation reduced the impact to a less-than-significant level, the EIR should have been revised and recirculated to address it. The plain wording of the Guidelines persuades us otherwise. Although there would be an increase in traffic

25

impacts, substantial evidence supports the conclusion that the proposed mitigation would reduce the impact to a level of insignificance. (See Guidelines, § 15088.5, subd. (a)(2).)[10]

We likewise reject the contention that the air quality impacts required recirculation of the EIR. Despite the disagreement of plaintiffs' consultant on the amount of road dust that would be generated under the trucking option, the staff memorandum discussed above points to substantial evidence that most of the air quality impacts of Revised Project II would be lower than those of the original project, and that where there were increased emissions under the temporary trucking option, they did not rise to a level of significance.

Plaintiffs also assert the EIR should have been recirculated to examine the effects of the conveyor on the Landing Way Depot wetland. In support they point out that the conveyor will be built over a .48-acre wetland area that was created as part of the mitigation required in connection with the 2004 approval of Shamrock's Landing Way facility. The 2004 Shamrock mitigation measure had provided: "Wetlands-related impacts will be developed in consultation with the Corps in accordance with their mitigation policies. . . . The creation of seasonal wetlands on the project site must be approved by the Corps. As an alternative, if the Corps does not approve the creation of

_____

[10] Plaintiffs also point out that a consultant's summary report prepared in September 2010 describing Revised Project II stated incorrectly that one truck trip in and one trip out would be required to transport 56,250 tons of "Recycled Input to/from Landing Way Depot," when in fact more than 2000 truck trips in each direction would be necessary to import that amount of material. Plaintiffs raised this question below. Drury's consultants responded by acknowledging that the summary report had made typographical and transcription errors, and stated that under Revised Project II, no recycled products would be imported from the Landing Way Depot to the Dutra site, that the recycled materials would come instead from "a variety of places throughout Sonoma and Marin Counties similar to the original project," and that "[t]he truck distribution is similar to what was analyzed in the Draft EIR but with 15,625 fewer trips because Dutra would be importing 93,750 fewer tons of recycled materials than previously proposed and analyzed in the Draft EIR." This provides substantial evidence that importation of the recycled material does not substantially increase the traffic impacts analyzed in the EIR.

the onsite seasonal wetlands, the applicant will purchase wetland creation credits at an approved wetland mitigation bank equal to the size and kind of wetland habitat lost."

The staff memorandum prepared for Revised Project II concluded that "[t]he construction of the conveyor would impact the entire .48 acres, a potentially significant impact absent mitigation. However, given the relatively low habitat quality of the wetlands and the fact that only a small portion of the wetland area will be filled (piers to support the conveyor), decommissioning of these wetlands and the securing of credits at the Burdell Wetland bank would serve to adequately mitigate the impacts to these jurisdictional wetlands to a less than significant level."

The staff memorandum relied for this conclusion in part on a September 24, 2010 summary report for Revised Project II prepared by WRA, an environmental consulting firm. The summary report explained that Shamrock's seasonal wetland was of relatively poor habitat quality and was dominated by non-native species. The report continued, "Perhaps the greatest value of the seasonal wetland is its current function for filtering surface runoff from the processing area before entering the river." According to the summary report, the Burdell Wetland Bank had been authorized by state and federal resource agencies to provide in-kind wetland mitigation credits for projects within its service area, which included the project site. The report concluded: "The loss of existing wetlands in the wetland mitigation area on the Landing Way Depot site would be a potentially significant impact under the Conveyor Option for the Revised Project II beyond those impacts under the original project. However, given the relatively low habitat quality of the existing wetland mitigation area, decommissioning this feature and securing credits at the Burdell Wetland Bank would adequately mitigate this impact to a less-than-significant level." This provides substantial evidence to support a conclusion that the impacts of Revised Project II on the Shamrock wetlands would not be significant.

We also reject plaintiffs' argument that in allowing Shamrock's wetlands to be decommissioned, the County effectively deleted a mitigation required in 2004 for the Shamrock project. This is not a case, like *Katzeff v. Department of Forestry & Fire Protection* (2010) 181 Cal.App.4th 601, 614, or *Lincoln Place Tenants Assn. v. City of*

27

*Los Angeles* (2005) 130 Cal.App.4th 1491, 1508–1509, in which a previously ordered mitigation measure was cancelled or disregarded without further environmental review. Rather, the County allowed the use of the alternate means of satisfying the 2004 Shamrock wetlands mitigation measure—that is, the purchase of wetland credits, which was expressly contemplated by that mitigation measure.

Additionally, plaintiffs argue that the EIR should have been revised to analyze the potential adverse effect of noise and vibration from the conveyor on the endangered salt marsh harvest mouse and other animals using the Shamrock wetlands. They point to a letter from a biologist, James Castle, commenting on the conveyor option. Castle noted that in 1990 the salt marsh harvest mouse had been found at the Alman Marsh, across the river from the Dutra site, and that other species, such as the California clapper rail, the California black rail, the white-tailed kite, and other species had also been found in the Alman Marsh. There is evidence, however, that the conveyors are a "relatively minor noise contributor as compared to the other noise sources," that the noise generated by the conveyors, as measured by nearby noise receptors, is below the existing ambient noise levels in the area, and indeed, lower than the noise level in an office environment, that vibration levels from the entire operation at an existing Dutra facility at another site showed vibration levels below the level of perception, and that vibration levels from the conveyor to endangered and threatened species at Alman Marsh and Shollenberger Park would be negligible due to the distance between them and the Landing Way Depot site. Moreover, a letter from WRA to the County reports that suitable habitat for the salt marsh harvest mouse was absent from area A of the project site, and that the salt marsh harvest mouse had not been found during surveys of the other areas. There was substantial evidence to support a conclusion that the EIR did not need to be revised and recirculated to address the effects of noise and vibration from the conveyor.

Thus, the County could reasonably conclude that none of the environmental effects of Revised Project II's extended conveyor constituted significant new information that required recirculation. There is substantial evidence that none involved a new significant environmental effect or a substantial increase in the severity of an

28

environmental effect absent mitigation, and we are not persuaded that extension of the proposed conveyor to the existing Landing Way Depot site rendered the EIR's project description so inadequate as to preclude meaningful review. (Guidelines, § 15088.5, subd. (a)(1), (2), & (4).) As we have explained, CEQA is not designed to freeze a project description in place, but rather allows changes in response to concerns raised during the review process. (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 199.) That is what happened here.

Finally, plaintiffs claim the EIR was inadequate because it failed to analyze the effects of the project on the health of workers at the asphalt plant. One of the comments on the FEIR stated that concentrations of particulate matter and silica would likely be highest on the project site, where project employees and truck drivers would be exposed to these contaminants; the commenter argued that the EIR should have evaluated these health risks. In response, the County noted: "Worker health and safety is regulated by the federal Occupational Safety and Health Administration (OSHA) and California's Division of Occupational Safety and Health (Cal-OSHA). The regulatory bodies set the maximum permissible exposure limits (PELs) for worker exposure to toxic air contaminants and the law requires that employers do not expose workers to concentrations above these levels. Section 5(a)(1) of the Occupational Safety and Health Act, often referred to as the General Duty Clause, requires employers to 'furnish to each of [their] employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees'. Section 5(a)(2) requires employers to 'comply with occupational safety and health standards promulgated under this Act'. The proposed project would be required to provide training and equipment necessary to reduce exposure to acceptable levels in accordance with federal OSHA and Cal-OSHA. As such, impacts related to the worker exposure to toxic air contaminants during operation would be less than significant."

Likewise, the EIR contained a discussion of worker health and safety regulations, which noted that worker health and safety was regulated by OSHA and Cal-OSHA; that

29

federal regulations required workers who came into contact with hazardous wastes to receive specialized training and medical supervision; that California's regulations for workers dealing with hazardous material included specific practices for construction and hazardous waste operation and emergency response, and that Cal-OSHA conducted on-site evaluations and issued notices of violation to improve health and safety practices.

Plaintiffs contend this discussion was inadequate, and that the EIR was required to make an independent evaluation of the effects of the project on workers' health. We disagree. An agency may properly rely on another agency's regulatory scheme in concluding an impact is less than significant. (See, e.g., *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 903–904 [Building Code standards for seismic safety]; *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 930–934 [energy efficiency standards].) The EIR and responses to comments on the FEIR provide substantial evidence to support the conclusion that the project would not cause significant effects on worker health and safety.[11]

### E. Brown Act

On October 12, 2010, the Board held a public meeting on Revised Project II, and heard comments from the public. At the end of the hearing, the Board took a "straw vote" on a motion to certify the EIR, adopt a statement of overriding considerations, and approve the project with the conveyor option. The straw vote resulted in three votes in favor of certification and approval, and two votes opposed. The Board continued the matter for final approval until December 14, 2010 to allow County staff time to prepare resolutions. At the December 14 meeting, the Board certified the EIR, adopted a statement of overriding considerations and a mitigation monitoring program, and

---

[11] Citing CEQA Guideline 15360, which defines " 'environment' " as "the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance," the trial court concluded CEQA does not require an EIR to address worker health. We express no opinion on the propriety of this view, but rather conclude that assuming CEQA encompasses worker safety, the EIR was not inadequate for failing to address this issue further.

approved the project, general plan amendment, and rezoning.[12]  It appears that certain documents were released to the public on the morning of the meeting.  According to plaintiffs, those documents included the conditions of approval of the project.  The Board did not allow additional public comments at the December 14 hearing.

Plaintiffs contend the Board violated the Brown Act by failing to allow further public comments at the December 14, 2010 hearing.  Government Code[13] section 54954.3 provides in pertinent part:  "Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item . . . .  However, the agenda need not provide an opportunity for members of the public to address the legislative body on any item that has already been considered by a committee, composed exclusively of members of the legislative body, at a public meeting wherein all interested members of the public were afforded the opportunity to address the committee on the item, before or during the committee's consideration of the item, unless the item has been substantially changed since the committee heard the item, as determined by the legislative body."

The parties disagree on whether the Board violated this provision:  according to defendants, at the October 12, 2010 hearing when public comments were heard, the Board was effectively acting as a "committee of the whole," and therefore it was not required to allow further public comments at the December hearing under section 54954.3.  Plaintiffs, on the other hand, supported by amicus curiae John McGinnis, reject the proposition that the Board acted as a committee at the October hearing, and contend

---

[12] According to a resolution, the FEIR consisted of the DEIR, the responses to comments circulated in July 2008, and three other documents:  a January 19, 2009 response to a letter submitted by plaintiffs' counsel and a summary report by the EIR consultant, Christopher A. Joseph & Associates, and the September 24, 2010 summary report on Revised Project II prepared by WRA.

[13] All further undesignated statutory references are to the Government Code.

31

that its action in approving the project in December without hearing further public comments should therefore be vacated.[14]

We need not resolve this issue, however, because we conclude that even if the Board should have allowed further public comments at the December 14, 2010 meeting, the remedy plaintiffs seek—a writ of mandate vacating the project approvals and related decisions—is unavailable for a violation of the public comment requirement. Section 54960.1, subdivision (a) provides in pertinent part: "The district attorney or any interested person may commence an action by mandamus or injunction for the purpose of obtaining a judicial determination that an action taken by a legislative body of a local agency in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 is null and void under this section." Those sections establish requirements for local legislative bodies' meetings to be open and public (§ 54953), for agendas to be posted before meetings (§ 54954.2), for descriptions of closed session items on agendas (§ 54954.5), for meetings held before adoption of new or increased taxes or assessments (§ 54954.6), for calling and providing notice of special meetings (§ 54956), and for emergency meetings (§ 54956.5). Section 54954.3, which requires legislative bodies to

---

[14] Defendants also contend we should not consider this issue because plaintiffs did not raise it adequately before the Board or the trial court. We disagree. Before the December 14, 2010 hearing, plaintiffs' counsel sent a letter to the Board asserting that section 54954.3, subdivision (a) required the Board to allow public comments. After the hearing, they sent letters demanding that the Board cure the alleged Brown Act violation, and pointing out that local agency representatives and members of the public were precluded from addressing the Board at the December meeting. The County responded by asserting that it had not violated the Brown Act, and quoted the portion of section 54954.3, subdivision (a), that provides an exception for matters that had previously been considered by a committee. In the trial court, plaintiffs asserted a cause of action for violation of the Brown Act and alleged that defendants did not cite any applicable exemption for statutory public hearing requirements, and argued in their briefing below that the County violated the Brown Act by not allowing public comments at the December meeting. Although plaintiffs never explicitly addressed below the applicability of the "committee" exception of section 54954.3, subdivision (a), they adequately preserved the issue of whether the County violated the Brown Act by refusing to allow public comment at the December meeting.

provide an opportunity for public comment, is not among the provisions enumerated in section 54960.1, subdivision (a).

Plaintiffs argue that nullification of the Board's actions is nevertheless an available remedy under the court's general power to grant mandamus relief. (Code Civ. Proc., § 1085.) In a similar argument, amicus curiae McGinnis contends this remedy is authorized by another provision of the Brown Act, section 54960, which provides in pertinent part: "The district attorney or any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this chapter by members of the legislative body of a local agency or to determine the applicability of this chapter to ongoing actions or threatened future actions of the legislative body . . . ."

We reject this contention. Under the principle of statutory construction that *expressio unius est exclusio alterius*, or " 'to express or include one thing implies the exclusion of the other,' " (*Imperial Merchant Services Inc. v. Hunt* (2009) 47 Cal.4th 381, 389) we conclude the Legislature intended to limit the remedy of declaring an agency's action null and void to violations of the enumerated statutory provisions. If the Legislature had intended this remedy to be available for violations of any provision of the Brown Act, its action in enumerating certain provisions in section 95460.1 would have been superfluous. (See *id*. at p. 390.) The fact that the Legislature expressly designated this remedy for violations of some provisions of the Brown Act indicates that it did not intend nullification to be available as a remedy for violations of other portions of the same statutory scheme.[15]

---

[15] In any case, it appears that section 54960 applies primarily prospectively, that is, that it applies to past violations only to the extent that "the showing of past violations that was made related specifically to present or future ones." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 916, fn. 6.) Plaintiffs make no argument that any alleged violation of the public comments requirement is related to a present or future violation.

## III.    DISPOSITION

The judgment is affirmed.


_____
Ruvolo, P.J.


We concur:


_____
Reardon, J.


_____
Humes, J.

34